Troy ACUFF *v.* STATE of Arkansas

5755                                    484 S.W. 2d 698

Opinion delivered September 25, 1972

*Jeff Duty,* for appellant.

*Ray Thornton,* Atty. Gen., by: *Robert H. Crank,* Asst. Atty. Gen. for appellee.

CARLETON HARRIS, Chief Justice. Troy Acuff was charged with assault with intent to kill Kenny Bowen. On trial, Acuff was found guilty and his punishment fixed at eighteen months imprisonment in the Arkansas Department of Correction. From the judgment entered in accord with the verdict, appellant brings this appeal. For reversal, it is simply contended that the court should have directed a verdict of not guilty, and the question therefore is whether there was substantial evidence to support the conviction.

Mrs. Roy Deatherage, a resident of Pleasure Heights in Benton County, testified that appellant lived on top of a little hill about 200 feet from the Deatherage home

which was located near the foot of the hill. She said that on the evening of September 6, 1971, Acuff drove up to her house and asked for her husband, but the latter had already retired. They talked for a few minutes and the witness stated that Acuff had been drinking and she could smell the odor of alcohol on his breath. While talking, her son, Danny Deatherage and two brothers-in-law, Kenny and David Bowen, ages 15 and 17 respectively, came up and they talked awhile. During the conversation, the boys mentioned that they were going to sleep in the Deatherage car which was parked some distance from the house.[1] Acuff had some chickens in his pickup truck and asked if they would help unload them, and David went with appellant to his home, helped unload the chickens, came back and went to the car. Mrs. Deatherage retired for the night and subsequently heard shooting coming from the hill near the Acuff chicken pen. "Well, I just heard some shotgun shots up on the hill, and I wondered, you know, what he was shooting at, Mr. Acuff was shooting at." She said she thought something was after his chickens and she went outside and commented to the boys that she wondered what Troy was shooting at. She then went back into the house, awakened her husband, and suggested that he "go see what was wrong with Mr. Acuff". About that time, she heard one of the boys scream, ran to the door, jerked it open and observed the boys running to the house. She said there were two shotgun blasts while they were running. One shot hit David in the corner of the left eye and one in the forehead.

David testified that after he returned from helping unload appellant's chickens, he got in the back seat of the car, Kenny being in the front seat, heard some shots, and stepped out of the car. The witness stated that he heard three of four shots and then he was struck, and he thought that he heard two shots while he was running to the house. Before being hit, David stated that he

---

[1]Mrs. Deatherage estimated the distance to be 200 feet "out" from the house; Mr. Deatherage said 100 feet; David Bowen said it was "right in front of the house."

saw Acuff standing on top of the hill, firing the gun.[2]

Kenny, who never did get out of the car until his brother was shot, corroborated the testimony of David, except that he could not see who was doing the shooting.

Clay Bowen, a part time worker for the sheriff, and a brother of the two Bowen boys, together with Deputy Sheriff Larry Anglin and two other officers, investigated the shooting and made the arrest of appellant. Deputy Sheriff Anglin testified that the shotgun was located in the bedroom; three empty shotgun shells, which had contained No. 4 shot, were found near the top of the hill. Another shell was found in front of the Acuff home. Anglin stated that Acuff had been drinking. William Fox, a neighbor, testified that some weeks after the shooting he talked with Acuff:

> "I was in my yard and Mr. Acuff was in Arthur Lee's yard and there was another gentleman with him, and he motioned for me to come over. And I went over there and he just said, 'Hi,' and I said, 'Well, what the hell happened up here?' And he said, 'Oh, it was an accident.' He says, 'The gun jammed.' He said, 'I must have turned to clear it and it went off.' "

Ronnie Todd, also a resident of Pleasure Heights, testified that he talked with Acuff subsequent to the shooting:

> "Well, he said he didn't know what they was doing if they wasn't stealing gas out of his pick up and that's all he said."

Acuff testified that on the day in question he had gone to Fayetteville, and on his return stopped at the Deatherage house to get one of the boys to help him un-

---

[2]A mercury vapor light was located west of the Acuff house, and the evidence reflects also that the porch light was burning at the time of the shooting. When asked what Acuff was shooting at, David replied, "He was shooting at nothing". When asked which way he was shooting, David reiterated several times, "Out the hill". Finally, he was asked if Acuff was shooting toward his (David's) left and the witness answered, "Uh, huh".

load some chickens; he said that he had drunk about three beers. One of the Bowen boys said that he would help him unload. "Well, I didn't pay no attention. I never did know the name. It was the biggest boy, the biggest one of the two." He said that after they unloaded the chickens, he thanked the boy for helping him. He decided he wanted to try his gun because he was going to trade it for a deer gun, and he fired at some cans and an old refrigerator. Acuff said that he fired three shots and then stated:

"I started to reload the gun and it jammed and I turned around to the right a little bit to where the light would shine on my gun and I pulled it back and slammed it up real hard and it went off."

Appellant emphatically denied any intent to kill, or to injure, anyone, and said that he had never had any trouble with Deatherage or the boys. The law relating to the offense of assault with intent to kill has been stated many times by this court. In *Lewis* v. *State*, 209 Ark. 51, 189 S.W. 2d 641, this court said:

"One of our most recent cases is that of *Craig* v. *State*, 205 Ark. 1100, 172 S.W. 2d 256, wherein we said: 'In order to sustain the charge of assault with intent to kill proof of two distinct elements are necessary: (1) a specific intent to take life, and (2) facts which would have been sufficient to have sustained a conviction of murder if death had resulted from the assault. [citing cases] ... Although the State is required to prove that the defendant actually intended to kill, it need not depend upon declarations made by the defendant to establish such fact. While the intent to kill cannot be implied as a matter of law, it may be inferred from facts and circumstances of the assault, such as the use of a deadly weapon in a manner indicating an intention to kill, or an act of violence which ordinarily would be calculated to produce death, or great bodily harm. In determining whether or not the intent to kill should be inferred, the trier of the facts may properly consider the character of

the weapon employed and the way it was used, the manner of the assault and the violence attendant thereon; the nature, extent and location on the body of the wound inflicted, if any; the state of feeling existing between the parties at and anterior to the difficulty; statements of the defendant, if any; and all other facts and circumstances tending to reveal defendant's state of mind. [citing cases]"

We think the evidence falls short of sustaining the charge of assault with intent to kill. It might be stated at the outset that no reason appears in the record as to why the charge listed Kenny Bowen as the intended victim. This 15 year old boy had no arguments, or difficulties, with appellant whatsoever, and did not even live at the Deatherage home. According to Acuff, he did not know the names of the two Bowen boys, and identified the one who helped him with the chickens as the "biggest one of the two". Kenny, as stated, did not go to the Acuff premises to unload the chickens, but rather went to the car on the Deatherage premises to spend the night. In other words, it is puzzling why appellant was charged with intent to kill Kenny rather than David, the boy who was shot. Even so, the question of motive is quite elusive. In fact, in only two places in the record do we find any possible reason for an intentional shooting. Mrs. Deatherage testified that her husband had taken Acuff to visit with his (Acuff's) daughter and her husband. Apparently, from her testimony, Acuff was angry because his youngest daughter, age 13, was going to stay with the older daughter and her husband rather than with him. It would appear that when Acuff reached the daughter's home, he was quite angry, and Deatherage went to Acuff's daughter and son-in-law the next day and apologized for taking appellant to their home. Mrs. Detherage said that appellant was displeased because Deatherage apologized to these people for taking him to their house. However, Acuff's reaction does not seem to have been more than displeasure. Mrs. Deatherage said that he made no threats and, in fact, asked her if she would talk with his youngest daughter and try to get her to come back home. Mrs. Deatherage agreed to do so. The only re-

maining testimony that reveals a possible motive was that of Ronnie Todd. From the record:

"Q. Did you ever discuss what happened on this date, on September the 6th?

A. No.

Q. What did he say?

A. Well, he said he didn't know what they was doing if they wasn't stealing gas out of his pick up and that's all he said.

Q. Where did this converation take place?

A. His daughter's house.

Q. Do you recall the date?

A. No, I don't."

This ended the examination of Todd, and the prosecuting attorney never, at any time, pursued the matter further. It is difficult to give this statement much weight for the evidence does not reflect that the boys were near the pickup truck after Acuff drove it to his home and unloaded the chickens with the help of David. Of course, another state witness, William Fox, testified that Acuff said the shooting was an accident; that his gun jammed. There is no other evidence that would indicate any malice or animosity on the part of Acuff toward any member of the Deatherage family. Mrs. Deatherage testified that they had been good friends with Acuff; that he had a garden and let the Deatherages use the garden; that he permitted the Deatherages to hook up to his meter on the electric line; that he permitted them to store furniture in his home (some of it still being there); that he furnished his pickup truck to help haul lumber for her husband; that he moved the Deathe-

rages' household furniture from Springdale when they moved to Pleasure Heights; that he never made any charge for any of these services. Mr. Deatherage corroborated his wife's testimony as to the friendship between the parties. David likewise testified that there had never been any trouble with Acuff and that he had been a "good neighbor".

Can the intent to kill or commit great bodily harm be inferred from the facts related? We think not. There was no disagreement, or altercation between the parties, no arguments and no threats, which generally precede an offense of this nature. Mainly however, the weakness of the state's case lies in the fact that the parties had been friends for quite some time, and, according to the testimony of Mrs. Deatherage, Acuff could not have been a better neighbor. Let it be remembered that one cannot be guilty of the offense of assault with intent to kill unless he would have been guilty of murder in the event of the victim's death. In *Craig* v. *State,* 205 Ark. 1100, 172 S.W. 2d 256, we pointed out that both the intent to kill and facts sufficient to establish murder if death should result are essential to sustain a conviction. Such evidence is not in this record.

Summarizing, the evidence, without being more fully developed, cannot sustain the charge of assault with intent to kill; however, this is not to say that it would not sustain a lesser offense. The judgment of the Benton County Circuit Court is accordingly reversed, and the cause remanded.

It is so ordered.

BYRD, J., would reverse and dismiss.