Kirby Joe COGGIN *v.* STATE of Arkansas

CR 03-372                                    156 S.W.3d 712

Supreme Court of Arkansas
Opinion delivered March 25, 2004

[Rehearing denied May 5, 2004.]

*James Law Firm,* by: *William O. James, Jr.,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Kent G. Holt,* Ass't Att'y Gen., for appellee.

D ONALD L. CORBIN, Justice. Appellant Kirby Joe Coggin appeals the order of the Craighead County Circuit Court

convicting him of the capital murder of his wife Carolyn Sue Coggin. On appeal, Appellant argues that the trial court erred: (1) in denying his motion for directed verdict, as the State failed to provide sufficient evidence that he acted with premeditation and deliberation, and (2) in denying his motion to suppress because the search warrant relied on by authorities lacked any probable cause that a crime had been committed. As Appellant was sentenced to a term of life imprisonment, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

On December 10, 2001, Natalie Barker reported to authorities that her mother, Carolyn, was missing, along with her 1993 white Mazda Protege. Barker, who lived across the street from Appellant and her mother, explained that she last saw her mother on December 6, 2001. She noticed that her mother did not appear to be at home the following evening, but did not grow concerned until the next day when Carolyn was still not at home. Barker called Investigator John Moore, with the Craighead County Sheriff's Office, on December 10 and expressed concern that her mother was missing. Moore, along with Investigator Gary Etter, were assigned to investigate the disappearance of Carolyn.

Moore and Etter attempted to reach Appellant to obtain information about Carolyn and finally met with him on December 14, 2001. During this meeting, Appellant told the investigators that he last saw Carolyn on Friday, December 7. Appellant stated that he believed Carolyn had taken the day off from work because she was not feeling well. He also stated that he had an appointment with his attorney at 2:00 p.m. to discuss filing bankruptcy and that he then went to look for a house where he had heard there might be a job. According to Appellant, on his way home he had a flat tire, and he managed to flag down another driver who gave him a ride to Wal-Mart. At Wal-Mart, Appellant called Carolyn and asked her to bring him some things to repair his flat tire. Carolyn picked Appellant up and drove him to his truck. Appellant told the investigators that Carolyn then got agitated and started asking him if he had a girlfriend. Appellant tried to calm her down and suggested they drop her car off and go get something to eat. They then left her car at a nearby Country Mart grocery store, and Carolyn got in the truck with Appellant. Appellant claimed that Carolyn again started accusing him of cheating on her and grew more agitated, so he took her back to her car and dropped her off between 7:00 and 8:00 p.m. Appellant claimed that that was the

last time he had any contact with Carolyn. Appellant also told the investigators that it was not like Carolyn to disappear like she had or to not show up for work.

Because Appellant indicated that Carolyn might have left the area, the Arkansas State Police were asked to assist with the investigation. Investigator Phil Carter, with the State Police, met with Appellant on December 19, 2001. During this particular meeting, Appellant stated that Carolyn began to accuse him of having a girlfriend about a week prior to her disappearance, after she found a piece of paper with the names and numbers of two women. He also told Carter that he and Carolyn had been arguing during the day of December 7, so he left home around 3:00 p.m. to find Rob Merrill to see if he had any work for him. He claimed that he went to Merrill's house, but that he was not home, so he drove around for a while until he had the problem with the flat tire. His statements regarding the events that followed were similar to the ones he gave Moore and Etter. Appellant also told Carter that it might be wise to look for Carolyn in rehabilitation facilities in Memphis, Hot Springs, or Little Rock, because he thought she might have checked herself into such a facility.

In the course of investigating Carolyn's disappearance, Moore and Carter interviewed Quinn Greer. Greer told the officers that on December 8, 2001, Appellant came to his home in Black Rock and asked him to go to Jonesboro with him to check on a job. He then told Greer that his wife had left him, and he was going to teach her a lesson by hiding her car. They drove to the Scottish Inn, where Appellant told Greer to drive his truck to a car wash across the street from the Country Mart grocery store. Soon after, Appellant arrived at the car wash driving Carolyn's Mazda Protege. Greer washed Appellant's truck, while Appellant washed Carolyn's car. Appellant then had Greer follow him to the GAW Mini Storage in Walnut Ridge, where he parked Carolyn's car inside Unit 70. Immediately thereafter, Appellant went across the street to a Dollar General Store and purchased two padlocks that he used to secure the storage unit.

On December 27, 2001, after receiving the information from Greer about Carolyn's missing vehicle, authorities obtained a search warrant for Unit 70. When police arrived at the GAW Mini Storage, they discovered two padlocks on the door to Unit 70. Once inside the unit, police discovered the missing vehicle. The vehicle's trunk lining had been removed and was sitting on top of the car. They obtained a subsequent warrant to search the interior

of the vehicle and to search other items stored in the unit. In a large utility box, officers discovered Carolyn's body. Inside the trunk of the car were two large trash bags. Inside the trash bags were several Wal-Mart sacks containing various items. Items discovered included a pair of white tennis shoes, paper towels that appeared to be stained with blood, and rubber and latex gloves. Officers also discovered a Wal-Mart bag containing a long-sleeved Duck Head shirt, a pair of blue jeans, a white cap, and a pair of socks. These clothes were later identified as belonging to Appellant.

Later that day, as officers were completing the processing of the crime scene, Appellant arrived at the storage unit. When he saw the police, he began to hurriedly leave. Moore and Carter then followed Appellant. After losing him in traffic, they noticed a truck similar to his parked in a nearby carport. After confirming that the truck belonged to Appellant, officers approached and discovered Appellant hiding in the truck. He was then taken into custody.

Following his arrest, Appellant gave a taped statement claiming that he had a flat tire on December 7 and that Carolyn came to pick him up and take him back to his truck. After he fixed the flat, Carolyn followed him back to town. Appellant drove to the Scottish Inn, where he claimed he left his truck and got into the car with Carolyn, and the two eventually drove to Otwell. Appellant asked her to stop the car, so that he could urinate. Both Carolyn and Appellant got out of the car, and Carolyn, who was agitated, pulled a gun on him and fired two shots. According to Appellant, he then grabbed for the gun, and when he tried to take it away from Carolyn, she fell back and was struck by a bullet. In response to a question about how many times he shot Carolyn, Appellant stated that she "was doing all this jerking and stuff and I was scared to death and I couldn't stand her suffering like that. I didn't know what else to do." Appellant then claimed that he did not know how many times he shot Carolyn. Appellant said that he found a plastic drop cloth in the trunk of Carolyn's car and that he used it to wrap around Carolyn's body. He then placed her body in the trunk of the car. The next morning, Appellant took Carolyn's car to the storage unit in Walnut Ridge. Appellant returned to the storage unit the next morning with a utility box and some duct tape. He then put Carolyn's body inside a couple of trash bags and placed it inside the box.

Appellant was charged with capital murder. A jury trial was held on August 5-8, 2002. Following the presentation of evidence, Appellant was found guilty of capital murder and sentenced to a

term of life imprisonment without the possibility of parole. From that order, comes the instant appeal.

## I. Sufficiency of the Evidence

For his first point on appeal, Appellant argues that the trial court erred in denying his motion for a directed verdict, because the State failed to introduce sufficient evidence proving that he acted with premeditation and deliberation in the death of his wife. Appellant argues that the State merely introduced circumstantial evidence of his mental state.[1] The State counters that circumstantial evidence may constitute sufficient evidence of an accused's mental state, as it did in this case. We find no error and affirm on this point.

██ ██ We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Parker v. State*, 355 Ark. 639, 144 S.W.3d 270 (2004); *Reed v. State*, 353 Ark. 22, 109 S.W.3d 665 (2003). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001).

██ Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003); *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999). In other words, if you have two equally reasonable conclusions as to what occurred, this merely gives rise to a suspicion of guilt, which is not enough to support a conviction. *Howard v. State*, 348 Ark. 471, 79 S.W.3d

---

[1] During oral argument of this case, counsel for Appellant attempted to concede that there was sufficient evidence to support the conviction if this court did not agree with his second argument on appeal regarding the suppression of evidence. Despite this concession, we are still obligated to review the evidence as we are required to address challenges to the sufficiency of the evidence first due to double jeopardy considerations.

273; *cert. denied*, 537 U.S. 1051 (2002); *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000). Upon review, this court's role is to determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Overwhelming evidence of guilt is not required in cases based on circumstantial evidence; rather, the test is one of substantiality. *Id.*

█ In Arkansas, a person commits capital murder if "[w]ith premeditated and deliberated purpose of causing the death of another person, he or she causes the death of any person." Ark. Code Ann. § 5-10-101(a)(4) (Supp. 2003). As for proof of the premeditated and deliberate intent necessary for capital murder, a criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Jenkins v. State*, 348 Ark. 686, 75 S.W.3d 180 (2002); *Leaks v. State*, 345 Ark. 182, 45 S.W.3d 363 (2001). Intent may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Id.* In addition, one is presumed to intend the natural and probable consequences of one's actions. *Id.*; *Spears v. State*, 321 Ark. 504, 905 S.W.2d 828 (1995).

While the evidence supporting Appellant's conviction is of a circumstantial nature, the evidence is consistent with the sole conclusion that Appellant acted with premeditation and deliberation in the murder of his wife. First, there was testimony regarding the couple's volatile relationship and that Carolyn feared for her own safety at the hands of Appellant. Barker testified that over the last six months preceding her death, her mother had expressed concern for her safety and told Barker that if anything ever happened to her, Appellant would be responsible for it. According to Barker, the last time Carolyn expressed such concern was approximately four to six weeks before she disappeared.

The State also presented evidence that Appellant and Carolyn were experiencing financial difficulties, which, in turn, caused problems in their marriage. Garland Gibson, a loan officer with MidSouth Bank testified that he had worked with Appellant and Carolyn on some loans they had through the bank. Particularly, Gibson testified about a loan the pair had for a Chevrolet truck. They fell behind on the payments, and Carolyn wished for the bank to repossess the truck, but Appellant did not want that to happen. According to Gibson, Carolyn expressed concerns for her safety, as she was afraid she would set Appellant off while trying to

convince him to relinquish the truck. Gibson also related a conversation he had with Appellant after he went to Appellant's home to repossess the truck. Appellant refused to turn over the keys to the truck and told Gibson that he was going to file bankruptcy and that he would bring him a copy of the bankruptcy filing.

Clarence Fisher testified that Carolyn contacted him on December 6, 2001, seeking financial assistance. Fisher owned a note on Carolyn's home, and she wanted to refinance the note. She told Fisher that Appellant wanted to declare bankruptcy, but that she did not want to do that. The next day, Fisher advised Carolyn to return the truck to the bank and that Gibson would refinance her loans and put her on a payment plan. Carolyn told Fisher that she would find Appellant and convince him to return the truck.

In addition, the State presented testimony of persons whom Appellant had contact with immediately following Carolyn's murder. This evidence established Appellant's attempt to conceal the crime. This court has recognized that efforts to conceal a crime, as well as lying to friends and police about one's involvement in a killing, can be considered as evidence of consciousness of guilt. *Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003); *Leaks*, 345 Ark. 182, 45 S.W.3d 363.

James Stallings testified that on the evening of December 7, at approximately 10:00 p.m., Appellant came to his room at the Scottish Inn and told him that he was having problems with Carolyn and that she had asked him to move out. Appellant told Stallings that he was going to meet someone who was going to help him move his belongings but that he did not want his truck seen at Carolyn's house. He asked Stallings to ride with him to Wal–Mart and then drive his truck back to the Scottish Inn and park it towards the back of the motel so that it could not be seen from the street. Stallings complied, and later that evening, at approximately 12:30 a.m., Appellant returned and retrieved the truck key from Stallings. Two weeks later, Appellant again visited Stallings and showed him an article that appeared in the Jonesboro Sun newspaper regarding his wife's disappearance. After Stallings read the article, Appellant told him not to tell anyone that he had seen him or that he had been at Stallings's room.

Greer testified that on the morning of December 7, Appellant came to his home looking to buy some marijuana. They left

Greer's house and drove to Pocahontas to buy the marijuana. Greer did not see Appellant again until the next day, when he came back to Greer's house, asking him if he wanted to go to work installing windows in some house. Greer then recounted going to the Scottish Inn and meeting Appellant at a car wash across the street from the County Mart grocery store. He also testified that he followed Appellant to Walnut Ridge, where Appellant drove around looking for a storage facility. Greer witnessed Appellant call and make arrangements to rent a storage unit. They then took Carolyn's vehicle to the storage facility. A couple of weeks later, Appellant returned to Greer's house. When he asked Appellant if he had heard any news on his wife's disappearance, he replied, "No, and ain't going to." Greer asked Appellant what he meant, and Appellant then confessed to Greer that he had killed Carolyn. Appellant explained to Greer that he took Carolyn to the Cache River and shot her. When Moore and Carter interviewed Greer on December 27, he told them about hiding Carolyn's car and Appellant confessing to her murder. He then took the investigators to the storage unit in Walnut Ridge.

Rodney Snyder, a loss-prevention officer with Wal-Mart, testified that in early December, two members of Carolyn's family contacted him and explained that Carolyn was missing and wanted to know if the store had any videotapes that might help ascertain her whereabouts. This request led Snyder to discover that Appellant had purchased a can of Fix-A-Flat, some tire plugs, and a 9 x 12 drop cloth from the store at approximately 8:40 p.m. on December 7. In all of his statements to authorities, Appellant never mentioned purchasing a drop cloth. During a second interview with Moore and Carter, Appellant was asked about purchasing a drop cloth at Wal-Mart on the night of the murder. Appellant claimed that he forgot to mention the drop cloth, but that he bought it because the area where he was going to have change the tire on his truck was muddy. In fact, he used this drop cloth to wrap around Carolyn's body before placing her in the trunk of the car.

Finally, the medical evidence in this case is consistent with a conclusion that Appellant acted with premeditation and deliberation. Dr. Stephen Erickson, a forensic pathologist with the Arkansas State Crime Lab, testified regarding the nature of Carolyn's

injuries.[2] Based on his review of the file in Carolyn's case, Erickson stated that the crime lab received the utility box containing Carolyn's body, which was wrapped in several layers of trash bags and a blue tarp. He testified that the examination of the body revealed three gunshot wounds. The first wound was a close-range shot to the left cheek, which exited the right cheek. According to Erickson, this wound would not have caused instantaneous death, as it hit no vital neurological structures. A second gunshot wound was located about two and one-half inches from the first one, resulting in the bullet entering Carolyn's brain. This second wound was also the result of a close-range gunshot. According to Erickson, these two wounds located on the left side of Carolyn's head came in succession, either first and second or second and third. A third wound was discovered on the right side of Carolyn's forehead. This wound was also a close-range gunshot wound. Dr. Erickson opined that this wound would have been fatal in and of itself. Based on the nature of her wounds, Erickson opined that Carolyn's death was a homicide.

▪ Appellant testified on his own behalf at trial, providing further evidence of his intent to murder his wife. During his testimony, he recounted the flat-tire incident and getting in the car with Carolyn and driving to Otwell. Appellant testified that after they got out of the car, Carolyn fired a gun at him. He stated that he tried to reach for the gun and that she fell and the gun discharged, hitting her in the head. He claimed that Carolyn was suffering greatly, so "I picked up the gun and I shot her two more times in the head and stopped her suffering." Appellant further stated, "I knew she was dying. I've hunted all my life, you know, I mean that's — people are animals too, you know, I mean, you just — I just had a gut feeling." Appellant's explanation that he shot Carolyn only after she fell to the ground, however, is inconsistent with the finding that each of these gunshot wounds were very close-range wounds. In fact, on cross-examination, Dr. Erickson opined that the shooter would probably have been less than one foot away from Carolyn at the time the shots were fired. In addition, the shot that was not fired in succession with the others would have been fatal, according to Dr. Erickson. This conclusion is inconsistent with Appellant's account that after the

---

[2] Medical Examiner Dr. Charles Kokes actually performed the autopsy on Carolyn, but was unavailable to testify at trial due to a medical problem.

first shot Carolyn was moaning and jerking and that he shot her two more times in order to end her misery.

This court has held that the jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Barrett*, 354 Ark. 187, 119 S.W.3d 485; *Cobb v. State*, 340 Ark. 240, 12 S.W.3d 195 (2000). Moreover, a defendant's improbable explanation of suspicious circumstances may be admissible as proof of guilt. *Baughman v. State*, 353 Ark. 1, 110 S.W.3d 740 (2003). Thus, the jury was not obligated to believe that Appellant shot his wife with the belief that he was putting her out of her misery. To the contrary, the jury could infer from Appellant's testimony that he formed the requisite premeditation when he picked up the gun and fired it at his wife. It is well settled that premeditation need not exist for a particular length of time, as it may be formed in an instant. *Bangs*, 338 Ark. 515, 998 S.W.2d 738.

Finally, this court has held that flight following the commission of an offense is a factor that may be considered with other evidence in determining probable guilt and may be considered as corroboration of evidence tending to establish guilt. *Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001), *cert. denied*, 540 U.S. 930, 124 S. Ct. 344 (2003). When Appellant arrived at the GAW Mini Storage and realized that authorities had searched the unit, he fled the scene and attempted to evade authorities; thus, providing more circumstantial evidence of his guilt.

In sum, the fact that the evidence establishing Appellant's guilt is circumstantial does not render it insufficient. As this court has stated, evidence of guilt is not less because it is circumstantial. *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003); *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). In fact, the evidence in the present case overwhelmingly establishes proof that Appellant acted with premeditation and deliberation. To be sufficient, circumstantial evidence must simply be consistent with Appellant's guilt and inconsistent with any other reasonable conclusion, as it was in this case. Accordingly, the trial court did not err in denying Appellant's motion for a directed verdict.

## II. Motions to Suppress

Appellant also argues on appeal that the trial court erred in denying his motions to suppress evidence. In this regard, Appellant argues that the physical evidence seized as a result of a search warrant should have been suppressed, as the search warrant lacked any probable cause that a crime had been committed. Appellant further argues that if the physical evidence is suppressed as a result of an invalid warrant, the statements he gave following his arrest should also be suppressed as fruit of the poisonous tree. The State counters that there is no requirement that a specific crime be alleged in order to render a search warrant sufficient and that the warrant in this case was based on a sufficient affidavit. The State is correct.

In reviewing the trial court's denial of a motion to suppress evidence, we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Romes v. State*, 356 Ark. 26, 144 S.W.3d 750 (2004); *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003).

Rule 13.1(b) of the Arkansas Rules of Criminal Procedure provides:

> The application for a search warrant shall describe with particularity the persons or places to be searched and the persons or things to be seized, and shall be supported by one (1) or more affidavits or recorded testimony under oath before a judicial officer particularly setting forth the facts and circumstances tending to show that such persons or things are in the places, or the things are in possession of the person, to be searched. If an affidavit or testimony is based in whole or in part on hearsay, the affiant or witness shall set forth particular facts bearing on the informant's reliability and shall disclose, as far as practicable, the means by which the information was obtained. An affidavit or testimony is sufficient if it describes circumstances establishing reasonable cause to believe that things subject to seizure will be found in a particular place. Failure of the affidavit or testimony to establish the veracity and bases of knowledge of persons providing information to the affiant shall not require that the application be denied, if the affidavit or testimony

viewed as a whole, provides a substantial basis for a finding of reasonable cause to believe that things subject to seizure will be found in a particular place.

The test for the adequacy of an affidavit set out in *Illinois v. Gates*, 462 U.S. 213 (1983), and adopted by our supreme court in *Thompson v. State*, 280 Ark. 265, 658 S.W.2d 350 (1983), was quoted in *State v. Rufus*, 338 Ark. 305, 993 S.W.2d 490 (1999), whereby this court stated:

> [t]he task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying the hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. *State v. Mosley*, 313 Ark. 616, 856 S.W.2d 623 (1993); *Rainwater v. State*, 302 Ark. 492, 791 S.W.2d 688 (1990).

*Id.* at 312, 993 S.W.2d at 494.

Nothing in Rule 13.1, nor in our case law setting forth the appropriate analysis in determining the sufficiency of a warrant, requires probable cause that a specific crime has been committed be established before a warrant can be issued. In fact, as this court recognized in *Yancey v. State*, 345 Ark. 103, 44 S.W.3d 315 (2001), in order for a search warrant to issue, evidence, either direct or circumstantial, must be provided to show that the *contraband or evidence of a crime* sought is likely in the place to be searched. In addition, an affidavit for a search warrant must set forth facts and circumstances establishing probable cause to believe that things subject to seizure will be found in the place to be searched. *Id.*

Turning to the affidavit supporting the search warrant in the present case, it is clear that the affidavit prepared and signed by Investigator Moore established probable cause that Carolyn's vehicle would be found in the storage unit. The affidavit stated in relevant part:

> Quinn Greer told Investigators Carter and Moore that on Saturday morning around 8:00 a.m. on 12-08-01, that Kirby Coggin came to

his home in Black Rock, Arkansas and asked him to go to Jonesboro to check on a job with him. They drove to the Scottish Inn on Parker Road in Jonesboro where Coggin then told Greer that his wife had left him and he was going to teach her a lesson and hide her car. Greer said that Coggin told him to drive his pickup to the car wash across from the Country Mart grocery store on Hwy. 49 and the 63 Bypass and that he would drive his wife's white Mazda to that same location. Greer said that when they arrived at the car wash that Coggin had him wash the pickup and Coggin washed the white Mazda. He said that Coggin then had him follow him to Walnut Ridge to the mini-storage where they put the white Mazda inside storage #70 and then Coggin went across the street to a Dollar General and bought two pad locks and placed them on the mini-storage. Greer said that Coggin then drove him home to Black Rock.

▪▪▪ Clearly, the facts provided in the affidavit give rise to an inference that a crime had been committed. The affidavit stated that the officers were investigating the disappearance of Carolyn and her vehicle. The facts contained in Moore's affidavit were sufficient to establish probable cause that Carolyn's vehicle was located in the storage unit and also gave rise to an inference that a crime had been committed. Accordingly, the trial court did not err in denying Appellant's motion to suppress.

*III. Rule 4-3(h) Review*

In accordance with Ark. Sup. Ct. R. 4-3(h), the transcript of the record before us has been reviewed for adverse rulings objected to by Appellant, but not argued on appeal, and no such reversible errors were found.

Affirmed.