

# SUPREME COURT OF ARKANSAS

No. CR–13–807

| | |
|---|---|
| JUSTIN JAMAILLE THORNTON<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered** April 10, 2014<br><br>APPEAL FROM THE LINCOLN COUNTY CIRCUIT COURT<br>[NO. CR–11–47]<br><br>HONORABLE BERLIN C. JONES, JUDGE<br><br><u>REVERSED AND DISMISSED</u>. |

**DONALD L. CORBIN, Associate Justice**

Appellant Justin Jamaille Thornton appeals from an order of the Lincoln County Circuit Court convicting him of capital murder, and sentencing him to life imprisonment without the possibility of parole. Thornton's sole argument on appeal is that the circuit court erred in denying his motions for a directed verdict because there was insufficient evidence to establish that he acted with the requisite intent of premeditation and deliberation. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(a)(2) (2013). We reverse and dismiss.

Officers with the Lincoln County Sheriff's Office received a call that the body of a black male had been discovered in a ditch on Brooklyn Road. According to Lt. Kenneth Davis, an officer assigned to investigate the case, the victim, later identified as Kwame Turner, had suffered a gunshot wound to the side of his face. Lieutenant Davis also stated that there

were scuff marks on the victim's back indicating that the body had been dragged down to the ditch. Authorities later discovered Turner's car at an apartment complex in Pine Bluff.

After police developed Thornton as a suspect, they obtained a warrant to search his residence, which sits behind a house on Boston Road. Lieutenant Davis stated that upon arriving at the residence, he noticed grass in the backyard that looked identical to grass found inside the front door of Turner's vehicle. There was also a blood stain on a back step, as well as what appeared to be blood inside the door. Officers also discovered a bag in the kitchen that contained a towel with red stains, believed to be blood, and a bucket with pinkish water and a mop in the kitchen near the backdoor. There were also several areas of what appeared to be blood on an orange chair in the living room. Also in the living room, investigators discovered a pair of house shoes and a pair of sweat pants, both of which appeared to have blood stains on them. Police found two .45-caliber bullets on a dresser in the bedroom, as well as five bullet casings on the ground about 100 yards away from Thornton's residence.

Police arrested Thornton on October 2, 2011, at the Executive Inn in Pine Bluff, in a room registered to Alex Reed, a friend of Thornton's. When police knocked on the door to the room, they heard a male say, "I'm going to lay face-down on the floor." Thornton initially told police that his name was Jamaille Thompson, but Lieutenant Davis recognized him as Thornton and took him into custody. Thornton was charged by felony information with one count each of capital murder, felony theft of property, possession of a firearm, and abuse of a corpse. The State also alleged that Thornton was subject to a sentence enhancement for using a firearm to commit a felony and as a habitual offender.

Prior to trial, Thornton filed a motion seeking to waive his right to a trial by jury. The circuit court held a hearing to inquire whether Thornton understood the nature of the right he was waiving and whether his waiver was being freely made. At this hearing, the State announced that it agreed to the waiver and as a result would not seek the death penalty. Thornton announced on the record that he understood and that he wished to be tried by the court. Thereafter, the circuit court granted Thornton's motion.

A bench trial was then held on February 19–21, 2013. At the close of the State's case, Thornton moved for a directed verdict on all charges. He specifically argued that the State failed to prove that he had murdered Turner. Thornton further argued that there was no proof that he had acted with premeditation and deliberation. The circuit court denied the motion. Thornton was the only defense witness and at the close of all the evidence, he again renewed his motions for a directed verdict. The circuit court denied the motions and took the case under advisement. The court then ruled from the bench that the State had proved the charges of capital murder, possession of a firearm, and abuse of a corpse. But, the circuit court reduced the felony-theft charge to a misdemeanor count of unauthorized use of a vehicle.[1]

The circuit court entered a sentencing order on March 4, 2013, finding Appellant guilty as set forth above. The circuit court sentenced Thornton to life imprisonment without the possibility of parole on the capital-murder charge; 240 months' imprisonment on the

---

[1]Thornton does not challenge the sufficiency of the evidence with any of these counts other than the capital-murder conviction.

possession-of-a-firearm charge; 240 months' imprisonment on the abuse-of-a-corpse charge; and 12 months' imprisonment in the county jail on the unauthorized-use-of-a-vehicle charge. In addition, the court imposed an additional term of 120 months' imprisonment as a firearm enhancement, pursuant to Arkansas Code Annotated section 16-90-120. The court ordered that the firearm enhancement and the sentence for abuse of a corpse were to be served consecutively, with the remaining terms to run concurrently. This timely appeal followed.

As his sole point on appeal, Thornton argues that the circuit court erred in denying his motions for a directed verdict because the evidence submitted by the State was insufficient to prove the charge of capital murder. More specifically, Thornton asserts that the State failed to establish that he acted with premeditation and deliberation, which is the requisite intent to establish the crime of capital murder. In support of his assertion, Thornton argues that all of the evidence presented was circumstantial and left the fact-finder to engage in speculation and conjecture in determining guilt. The State counters that the circuit court correctly denied the directed-verdict motions as there was ample proof to establish Thornton's guilt. The State further asserts that circumstantial proof may constitute sufficient evidence and does so in this case.

Although Thornton moved for a directed verdict, such a motion at a bench trial is a motion for dismissal. A motion to dismiss at a bench trial and a motion for a directed verdict at a jury trial are both challenges to the sufficiency of the evidence. *See* Ark. R. Crim. P. 33.1 (2013); *Stewart v. State*, 362 Ark. 400, 208 S.W.3d 768 (2005). In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by

substantial evidence, direct or circumstantial. *Stevenson v. State*, 2013 Ark. 100, ___ S.W.3d ___. Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.*

Circumstantial evidence may constitute substantial evidence to support a conviction. *Wallace v. State*, 2009 Ark. 90, 302 S.W.3d 580. The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Id.* Such a determination is a question of fact for the trier of fact to determine. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Wallace*, 2009 Ark. 90, 302 S.W.3d 580.

A defendant commits capital murder, if, with the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person. Ark. Code Ann. § 5-10-101(a)(4) (Repl. 2013). Premeditated and deliberated murder occurs when the killer's conscious object is to cause death, and he forms that intention before he acts and as a result of a weighing of the consequences of his course of conduct. *Williams v. State*, 2011 Ark. 432, 385 S.W.3d 157. Moreover,

> [i]n order to prove that an accused acted with a premeditated and deliberated purpose the State must prove: (1) that the accused had the conscious object to cause the death of another; (2) that the accused formed the intention of causing the death before acting; and (3) that the accused weighed in his mind the consequences of a course of

SLIP OPINION

conduct, as distinguished from acting suddenly on impulse without the exercise of reasoning power.

*Ward v. State*, 298 Ark. 448, 451, 770 S.W.2d 109, 111 (1989); *see also O'Neal v. State*, 356 Ark. 674, 682, 158 S.W.3d 175, 180 (2004) (quoting *Ford v. State*, 334 Ark. 385, 389, 976 S.W.2d 915, 917 (1998) ("Deliberation has been defined as 'weighing in the mind of the consequences of a course of conduct, as distinguished from acting upon a sudden impulse without the exercise of reasoning powers.'")). But, premeditation is not required to exist for a particular length of time. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). It may be formed in an instant and is rarely capable of proof by direct evidence but must usually be inferred from the circumstances of the crime. *Pearcy v. State*, 2010 Ark. 454, 375 S.W.3d 622.

In reviewing Thornton's sufficiency challenge, we turn to the evidence adduced at trial. Bobby Humphries, chief latent-print examiner with the Arkansas State Crime Laboratory, testified that he had examined the evidence submitted in this case. This included a plastic-mold impression of a partial shoe print that Lieutenant Davis had discovered near the victim's body. The mold was sent to the state crime lab, along with a pair of tennis shoes that Davis recovered from Thornton after his arrest. Humphries stated that the pattern in the cast of the print was consistent with the pattern of the Nike shoes Davis recovered when he arrested Thornton. He further stated that the physical size of the heel area of Thornton's Nike shoe corresponded with the physical size of the cast. However, on cross-examination, Humphries explained that he could not state with certainty that it was the Nike shoe that had

made the print by the victim's body. He explained that other shoes, including other brands, could have similar patterns.

Kimberly Phillips, a crime-scene technician with the Pine Bluff Police Department, testified that she was called to process Turner's vehicle after it had been located. She stated that there did not appear to be any blood on the inside of the vehicle, but there did appear to be blood in the trunk and on the bumper. According to Phillips, there were two spent shell casings in the car, one on the driver's seat and one in the floorboard, as well as two pieces of grass located just inside the left front door. Upon processing the vehicle for evidence, Phillips swabbed areas of the steering wheel, blinker, and gear shift, as well as the areas in the trunk and on the bumper that appeared to be blood stains.

Vickie Jackson testified that she lived in a house on Boston Road near the house where Thornton resided and knew both Thornton and Turner. On the night of the murder, Jackson stated that she did not see Turner but that his car was parked next to Thornton's, outside Thornton's house. Later that evening, between 8:00 and 8:30 p.m., Jackson was walking back from her mother-in-law's house to her house when she heard a gunshot come from Thornton's house. She stated that she continued walking and Thornton came to the door and said, "Ms. Vickie, I'm okay. I just dropped my gun. It went off on the floor." According to Jackson, Turner's car was still parked outside Thornton's residence when this happened, but the next morning when she left for work, she noticed that Turner's car was gone. Jackson stated that as far as she knew, Thornton and Turner got along well.

Marcus Kennedy, a neighbor of Thornton's, testified that Thornton was his wife's cousin and that he knew who Turner was and recognized him when he saw him. According to Kennedy, he saw Turner's vehicle parked at the back door of Thornton's house, with the rear of the vehicle pulled up next to the doorstep. Kennedy opined that it looked like Thornton was about to load something. Kennedy denied ever hearing a gunshot on the night of the murder. Kennedy also testified that Thornton had previously been at his house target shooting with a .45 High Point semiautomatic weapon. Kennedy further stated that he was not aware of any kind of argument between Thornton and Turner.

Thornton's cousin, Tyrone Hellums, who also lived on Boston Road, testified that he knew both Thornton and Turner and knew them to be friends. Hellums stated that on September 29, 2011, he saw Turner's vehicle pulling into a driveway and assumed Turner was going to Thornton's house. According to Hellums, Thornton later called him and asked Hellums what he was doing. Thornton then met Hellums outside and walked with him to Marcus Kennedy's house. During this walk, Hellums did not notice Turner's car at Thornton's residence. He stated that later that same night Thornton called him again and stated that he needed help with something. Hellums went outside, and Thornton was there. The pair began walking toward Thornton's house and about halfway there, Thornton asked Hellums if he had change for a $100 bill. When Hellums said he did not, Thornton turned and returned home. According to Hellums, when he learned the next day that Turner had been killed, he called Thornton and Thornton stated that he was going to call and make sure people "knew that he didn't do it." Hallums further stated that the next time he talked to

Thornton, Thornton stated that people were saying he had killed Turner and that they were looking for him and that he had guns loaded and ready for them. Thornton called Hellums again that day and said that "when stuff happened in his house something got on the couch."

Alex Reed testified that on the evening of the murder, between 9:00 and 10:00 p.m., he received a phone call that Thornton was at Reed's grandmother's house. Reed went over to pick up Thornton and stated that Thornton was not acting out of the ordinary at that time. According to Reed, Thornton stayed with him the next two nights, and on the third night, Reed rented Thornton a hotel room at the Executive Inn. Reed stated that he rented the room because Thornton did not have any identification.

Dr. Stephen Erickson, deputy chief medical examiner at the Arkansas State Crime Laboratory, testified that he had performed the autopsy on Turner. He stated that there was a single gunshot wound to the head, with an entrance wound above the left ear and exit wound on the right jaw area. Dr. Erickson opined that it was likely that once the bullet exited the jaw, it entered the right arm and remained there. According to Dr. Erickson, he could not say how far away the gun was when it was fired, but there was no evidence of close range of fire. He further explained that the muzzle of the gun was not close enough to the skin to mark it. He stated that most close-range gunshot wounds are within a foot and a half or two, no more than three feet away. Dr. Erickson also testified that the direction of the wound was from left to right, downward and back to front. Dr. Erickson agreed that it was possible that the victim could have been sitting in a chair and that the angle was consistent with a wound from a bullet that had entered the back of his head, exited his jaw, and entered

his arm. While he admitted that there was nothing inconsistent with this scenario in his review, "scene investigation has to be decided by a lot more investigation than me." Dr. Erickson also stated that he ruled the manner of death to be a homicide, or at the hands of another person. On cross-examination, Dr. Erickson stated that there were many possible scenarios to explain the track of this wound.

Zachary Elder, a firearm and tool-marks examiner at the Arkansas State Crime Laboratory, testified that the bullet recovered from the victim was a .45-caliber bullet. Elder opined that, based upon the general characteristics of rifling, the bullet that struck Turner had been fired from a High Point .45-caliber firearm. Elder further stated that he compared that bullet to seven shell casings submitted as evidence and determined that they had all been fired from the same .45-caliber weapon.

Morgan Nixon, a forensic DNA analyst at the Arkansas State Crime Laboratory, testified that a blood sample from the orange chair at Thornton's residence matched Turner's DNA, as did the swab of blood from the trunk and bumper of Turner's car. She further stated that the blood on a sock that had been found on Thornton's back step also matched Turner's DNA. She admitted, however, that no forensic evidence had been retrieved from Turner's car to link Thornton to that car.

Greg Harmon, warden at the Wrightsville Unit of the Arkansas Department of Correction (ADC), testified that Thornton was incarcerated there while awaiting trial. During that time, Harmon was notified that a suspicious letter had been discovered during a routine mail-room check. There were question marks in place of a return name and

address, and it was addressed to a "Mrs. Hallums," mother of State's witness, Tyrone Hallums. The letter stated that Tyrone had helped move Turner's body and could get into trouble and advised that if anyone talked to police or testified at trial they would be harmed. Because the letter referenced the September homicide and contained threats, Harmon turned it over to ADC officials, who, in turn, submitted it to Lieutenant Davis. Davis showed the letter to Kristi Hunter, who had been Thornton's juvenile probation officer. When she saw the letter, she immediately stated that she recognized the handwriting as that of Thornton's. As a result of the investigation into the letter, ADC authorities ordered that Thornton was to be transferred to the Varner Supermax Unit.

Thereafter, Thornton took the stand in his own defense. He stated that he and Turner had been friends since kindergarten and had not had any fights or arguments. According to Thornton, on the day of the murder, he was in Pine Bluff the entire day with a friend, Brianna Christian. Thornton denied that he had ever lived at the residence on Boston Road or that he had seen or talked to Vickie Jackson that day. Thornton stated that she was lying and thus must have had something to do with the murder. He further denied owning a gun or killing Turner.

Clearly, the foregoing evidence establishes that Turner was shot and killed inside Thornton's house; however, this evidence is insufficient to support a conclusion that Thornton killed Turner with a premeditated and deliberate intent. To establish the requisite mens rea for capital murder, the State was required to prove that Thornton had the conscious object to cause Turner's death, that such an intention was formed before he acted, and that

11

he weighed in his mind the consequences of his course of conduct. *See Williams*, 2011 Ark. 432, 385 S.W.3d 157.

This court has recognized that intent may be inferred from the circumstances of the crime. *Weaver v. State*, 324 Ark. 290, 920 S.W.2d 491 (1996). More specifically, this court has held that premeditation and deliberation may be inferred from the type and character of the weapon; the manner in which the weapon was used; the nature, extent, and location of the wounds; and the accused's conduct. *Robinson v. State*, 363 Ark. 432, 214 S.W.3d 840 (2005). In this vein, this court has held that evidence of multiple close-range gunshots is consistent with a conclusion of premeditation and deliberation. *See Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004). Here, however, Dr. Erickson testified that there was no evidence of close-range fire, and, in fact, he stated that a close range would be anywhere from one to no more than three feet. When asked from how far away the shot could have been fired, Dr. Erickson stated that it "[c]ould be a mile away," and explained that it would depend on the length of the room.

As to the location of a wound, this court has upheld findings of premeditation in cases where the evidence showed that a victim was shot multiple times from behind. *See, e.g.*, *Farris v. State*, 308 Ark. 561, 826 S.W.2d 241 (1992). Here, the State asked Dr. Erickson if it was possible that Turner was seated in a chair when the bullet entered the back of his head, and Erickson agreed it was possible. But, he went on to state that even though there was nothing in his review that was inconsistent with such a theory, "the scene investigation has

12

to be decided by a lot more investigation than me." Moreover, he admitted on cross-examination that there could be multiple scenarios explaining the trajectory of the bullet.

In trying to demonstrate that the circumstantial evidence presented in this case was of a sufficient force to compel the conclusion that Thornton acted with premeditation and deliberation, the State relies specifically on the medical examiner's description of the fatal wound and the location of the blood evidence on the chair in Thornton's house. The State asserts that there is no likelihood that the gunshot was the result of the gun being dropped or mishandled. Whether the evidence could establish another likely scenario for what transpired inside Thornton's home is not the proper inquiry, however, where the record in this case demonstrates that the circuit court reached its conclusion by engaging in speculation and conjecture in concluding that Thornton acted with premeditation and deliberation. Specifically, in considering the charge of capital murder, the circuit court stated as follows:

> When we talk about capital murder and first-degree murder, they get rather close. And the differentiating difference is premeditation and deliberation. And we've defined those two. When we go back again and we consider that the defendant is a reasonably intelligent human being who has been exposed to weapons, who have shot a .45-caliber pistol, it has been testified to, more than three times, because we have witnesses who have been with him when he has shot them, as such, and he shot them multiple rounds in that. He understands what a .45-caliber pistol will do to a human being and a human head. To take such a weapon and point it toward someone's head and squeeze the trigger, it is, in this Court's mind, impossible for one who does not appear to be under the influence of any substances, one who does not have any particular anger or vengness [sic] toward a person, one who is not in a self-defense mode, but to pick up that pistol and walk up behind someone and squeeze a round off into their head, the Court believes you've got to give some thought to what this could do. And since there is nothing in the record that shows anything else than an intentional act, that is deliberate. Therefore, the Court finds that in what was done here, the Court concludes that from the record presented in this matter, the defendant

acted with premeditation and deliberation in causing the death of Kwame Turner, and thus he is guilty of capital murder.

There are two problems with the circuit court's reasoning. First, while the forensic evidence was consistent with a conclusion that Turner was shot from behind, there was absolutely no evidence that Thornton deliberately picked up a gun, walked behind Turner, pointed the gun at his head, and "squeez[ed] a round off into" Turner's head. As Dr. Erickson noted, there were multiple scenarios that could account for the bullet's trajectory. As previously stated, where a case rests on circumstantial evidence, such evidence must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Morgan v. State*, 2009 Ark. 257, 308 S.W.3d 147.

It is true that whether the evidence excludes every other hypothesis is a question for the fact-finder, here the circuit court. *Id.* The problem that arises in this instance is that the circuit court, in weighing the evidence, improperly shifted the burden of proof to Thornton. The circuit court concluded that this was a deliberate, intentional act because "there is nothing in the record that shows anything else." In reaching this conclusion, the circuit court posited that there was no evidence that Thornton was intoxicated, angry, or acting in self-defense and, thus, he must have acted deliberately. But, Thornton was not required to allege or offer proof of any such defenses, particularly where his defense was one of wholesale denial. It is, of course, a fundamental principle of criminal law that the State has the burden of proving the defendant guilty beyond a reasonable doubt. *Marks v. State*, 375 Ark. 265, 289 S.W.3d 923 (2008). Accordingly, because the circuit court engaged in speculation in

14

determining that Thornton acted with premeditation and deliberation and improperly shifted the burden of proof when weighing the evidence, we must reverse Thornton's conviction for capital murder. While the evidence cannot sustain the charge of capital murder, we offer no opinion about whether it would sustain a lesser offense. *See, e.g.*, *Acuff v. State*, 253 Ark. 85, 484 S.W.2d 698 (1972).

Reversed and dismissed.

BAKER and GOODSON, JJ., dissent.

**COURTNEY HUDSON GOODSON, Justice, dissenting.** The majority fails to view the evidence in the light most favorable to the State and, therefore, errs in holding that there was no substantial evidence to support the

finding of premeditation and deliberation to support Thornton's conviction of capital murder. In addition, the majority errs in finding that the trial court shifted the burden of proof to Thornton based on a comment made by the trial judge, an argument that was not made by Thornton on appeal. Because of these errors by the majority, I respectfully dissent.

In criminal appeals, our standard of review is that of substantial evidence, even when the case is tried to the bench. *See Witcher v. State*, 2010 Ark. 197, 362 S.W.3d 321. In addition, we view the evidence in a light most favorable to the appellee and resolve all inferences in favor of the appellee. *Sharp v. State*, 350 Ark. 529, 88 S.W.3d (2002). Also, disputed facts and determinations of credibility are within the province of the fact-finder. *Id*. Furthermore, circumstantial evidence may constitute substantial evidence to support a criminal conviction. *Jefferson v. State*, 372 Ark. 307, 276 S.W.3d 214 (2008). The long-

standing rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. *Id.* Most importantly to our standard of review, the question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. *Wells v. State*, 2013 Ark. 389, ___ S.W.3d ___. Upon review, this court determines whether the jury resorted to speculation and conjecture in reaching its verdict. *Norris v. State*, 2010 Ark. 174, 368 S.W.3d 52. Overwhelming evidence of guilt is not required in cases based on circumstantial evidence; the test is one of substantiality. *Dixon v. State*, 2011 Ark. 450, 385 S.W.3d 164.

This case involves a single gunshot wound to the back of the victim's head during a shooting that took place in the defendant's home. In its decision, the majority pays mere lip service to this court's long-standing rule that we view the evidence in the light most favorable to the State, considering only that evidence which supports the verdict. *Fernandez v. State*, 2010 Ark. 148, 362 S.W.3d 905, 907. Rather than viewing the evidence in the light most favorable to the State, the majority impinges on the fact-finder's province and independently determines that the State did not exclude every reasonable hypothesis but that of guilt. For instance, the majority acknowledges that the medical examiner testified that the bullet entered the victim's head from behind the left ear and traveled in a downward trajectory, but immediately discounts this testimony by pointing out that the medical examiner testified on cross examination that "there were many possible scenarios to explain the track of this wound." Curiously, the majority then implies that this court has always required evidence

of multiple gunshots wounds to show premeditation and deliberation, as though it is impossible to show that the intent to kill exists in a single shot when there are no witnesses to the crime. However, this court has previously recognized that pointing a loaded gun at the victim is sufficient to support a capital-murder conviction. *Jordan v. State*, 356 Ark. 248, 253-54, 147 S.W.3d 691, 694 (2004) (decision under prior law affirming capital-murder conviction and holding that the fact that the defendant pointed a loaded gun at the victim was sufficient to satisfy the requirement that he acted under circumstances manifesting an extreme indifference to the value of human life when the victim died as the result of a single gunshot wound not fired at close range) (citing *Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996) for the proposition that the act of pointing the weapon was sufficient to constitute the requisite circumstances regardless of whether there was an actual intent to shoot)). As this court stated in its early case law, "if a man willfully and deliberately points a gun, or a pistol, which he knows to be loaded with powder and ball, at another's head or heart, fires it and kills him, not having received any provocation from him, surely there is as much malignity in his heart, there is as little excuse for him, and there is evidence of as willful, deliberate and premeditated a purpose to kill, as if he had waylaid him." *McAdams v. State*, 25 Ark. 405, 415 (1869). These cases are consistent with this court's precedent that premeditation and deliberation may be inferred from the type and character of the weapon, the manner in which the weapon was used, the nature, extent, and location of the wounds, and the accused's conduct. *Carmichael v. State*, 340 Ark. 598, 602, 12 S.W.3d 225, 228 (2000) (recognizing that premeditation is not required to exist for a particular length of time, may be formed in an instant, and is rarely

17

capable of proof by direct evidence but must usually be inferred from the circumstances of the crime).

In addition, the majority acknowledges witness testimony that Thornton was at his residence with the victim the night of the murder, that Thornton told someone that his gun accidently discharged, and that Thornton told another person that when "stuff happened something got on his couch." All of this testimony was inconsistent with Thornton's own testimony that he neither lived at the residence nor was present on the night of the shooting. *Howard v. State*, 348 Ark. 471, 485, 79 S.W.3d 273, 282 (2002) ("Although circumstantial, evidence that an accused was seen in proximity to the scene of a crime, as well as evidence that he offered an improbable explanation of suspicious circumstances, can be evidence of guilt."). Forensic evidence found in Thornton's home revealed a large amount of the victim's blood on the back steps and on a couch inside the home. Moreover, the State introduced evidence that Thornton took the victim's body, placed it in the trunk of the victim's car, drove to a ditch, and dumped the body on the side of the road. *See Sanders v. State*, 340 Ark. 163, 168, 8 S.W.3d 520, 524 (2000) (noting that where the defendant disposed of the victims' bodies by dumping them in a well, such an action supported the jury's determination that premeditation and deliberation were proven). The State also presented witness testimony that Thornton had been seen shooting a .45 caliber High Point semiautomatic handgun, the same type of gun that the fired the bullet retrieved from the victim's body. Finally, there was testimony that Thornton wrote a threatening letter regarding the testimony of three witnesses for the State. The entirety of the evidence, when viewed appropriately in the light most

favorable to the State, constitutes substantial evidence supporting Thornton's conviction for capital murder.

The majority seems to emphasize that there was no testimony of any disagreement between Thornton and the victim, but that factor alone cannot be sufficient to overcome the substantial evidence presented by the State because this court has previously recognized that premeditation does not require any prior knowledge or interaction with the victim by the perpetrator. *Davis v. State*, 251 Ark. 771, 774, 475 S.W.2d 155, 156 (1972) (finding that there was sufficient evidence of premeditation and deliberation despite the fact that there was a total lack of evidence that the victim and defendant had ever met prior to the defendant striking the victim in the head with a wooden post). In addition, the fact that the victim was shot only once is not sufficient to eliminate the possibility of a premeditated or deliberate killing. *See Shaw v. State*, 299 Ark. 474, 482, 773 S.W.2d 827, 831 (1989) (finding that there was substantial evidence from which the jury could infer premeditation and deliberation sufficient to support a conviction for attempted capital murder when the defendant fired one shot at a police officer while fleeing) (citing *Stout v. State*, 263 Ark. 355, 565 S.W.2d 23 (1978)). However, what is truly concerning, is that the majority never identifies what reasonable hypothesis the State failed to exclude, but yet it concludes that the fact-finder erroneously determined that there was evidence of premeditation and deliberation from a single gunshot wound to the back of the victim's head.

When analyzing the majority's decision, however, I am also troubled by its conclusion that the trial court shifted the burden of proof to Thornton. Thornton does not raise the

19

argument that the trial court improperly shifted the burden of proof. I acknowledge that this court has previously held that the State's burden of proving guilt beyond a reasonable doubt is necessary to preserve a defendant's presumption of innocence and is an issue akin to the right to a jury trial in that both are fundamental rights. *Anderson v. State*, 353 Ark. 384, 108 S.W.3d 592 (2003). Unlike many other constitutional rights, the State's burden of proof beyond a reasonable doubt may not be waived once the accused pleads not guilty. *Id*. Moreover, we have held that we will address an argument that the State improperly shifted the burden of proof under the third *Wicks* exception, despite the lack of a contemporaneous objection below. *Id*. at 395, 108 S.W.3d at 599 ("The four *Wicks* exceptions are (1) when the trial court fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself; (2) when defense counsel has no knowledge of the error and hence no opportunity to object; (3) when the error is so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury correctly; and (4) Ark. R. Evid. 103(d) provides that the appellate court is not precluded from taking notice of errors affecting substantial rights, although they were not brought to the attention of the trial court."). What is troublesome, however, is the majority's finding that the trial court itself shifted the burden of proof to Thornton based on the statement that "there is nothing in the record showing anything other than an intentional act," an argument that is simply not presented. Moreover, a prosecutor may mention the fact that the State's evidence has remained undisputed. *Rounsaville v. State*, 2011 Ark. 236. Here, the trial court's statement is more in line with a conclusion that the State's evidence that this was an

intentional act was undisputed. However, because we do not have a developed argument on this point, I cannot join the majority's decision to anchor its holding on this single statement.

Based on the majority's failure to view the evidence in the light most favorable to the State and its decision to address a burden of proof argument that was not presented on appeal, I respectfully dissent.

BAKER, J., joins.

*Potts Law Office*, by: *Gary W. Potts*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Nicana C. Sherman*, Ass't Att'y Gen., for appellee.