2010 Ark. App. 805

**Kenric PARTEE, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–460.**

Court of Appeals of Arkansas.

Dec. 8, 2010.

Rehearing Denied Jan. 12, 2011.

Daniel Gene Ritchey, Blytheville, for appellant.

Dustin McDaniel, Atty. Gen., Laura Shue, Asst. Atty. Gen., Little Rock, for appellee.

LARRY D. VAUGHT, Chief Judge.

Appellant Kenric Partee appeals from the trial court's denial of his motion to suppress the cocaine that was found on his person following a roadblock instituted by the Gosnell Police Department. On appeal, Partee claims that the roadblock amounted to an illegal search and seizure and that all fruits of the illegal stop should be suppressed. We disagree and affirm the decision of the trial court.

The outcome of this appeal turns on the constitutionality, or lack thereof, of a 2008 roadblock that was instituted for the express purpose of removing non-safety compliant drivers from Arkansas roadways prior to increased July 4th holiday-weekend travel. The safety checkpoint was conceived by the Commissioners of the Gosnell Police and Fire Departments. Fire Chief Bobby Trump testified that he and Police Chief Fred Roberts discussed locating the checkpoint station on the main highway (State Highway 151), because the area was well-lit, it could be narrowed to one-way traffic each way, and there was a clear, safe area to remove cars from the main roadway if necessary.

Based on officer availability, June 27, 2008, was selected as the date to carry out the safety-check operation. Participating in the checkpoint were officers from the Gosnell Police Department, the Arkansas State Police, the Mississippi County Sheriff's Department, and the Blytheville Police Department. The checkpoint was in force beginning at 9:00 p.m. and continuing through midnight. Six officers were present and were able to check three to four cars each way. The five-lane highway had a speed decrease at the point of check that went from fifty to thirty-five miles per hour. The two outside lanes of the highway were closed, and blue lights, directional lights, and officers wearing reflective vests were used to direct drivers to the two center lanes. According to the record, at most, five vehicles were stopped at once.

The officers were instructed by Trump to stop every vehicle, check for valid license, insurance, and registration. If the driver complied and all was in order, the driver was permitted to pass through. However, if the driver was unable to comply, further checks were ordered. Furthermore, Trump instructed the checkpoint "chase cars" to pursue only the drivers who avoided the checkpoint by doing a U-turn in the highway. This particular checkpoint (the third one of its kind that year) produced one felony arrest, two DWI arrests, eleven traffic citations for no insurance or driver's license, and one arrest pursuant to a failure-to-appear warrant.

Gosnell Police Department did not have a written policy on checkpoints; did not account for how many total cars were stopped; did not publicize the checkpoint; and did not advise motorists they were approaching a checkpoint. Trump responded that his checkpoint priorities were to ensure the location had ample visibility and room to pull over vehicles. He also stated that he strived for consistency and ordered that every car be stopped in order to avoid any profiling or pretext concerns.

Gosnell Police Department Captain Robert Lewis testified that he did the briefing and position assignments following orders from Trump and Roberts. A memo Lewis generated after the checkpoint stated that all officers were appropriately briefed; all cars were stopped; the officers held the drivers no longer than was necessary to

execute all required checks; and all officers wore reflective vests during the checkpoint. According to the officers' testimony, a driver was released if he had a license, registration, and proof of insurance. However, if a driver did not have a license, a local check through the criminal-information system was done relating to the validity of the license.

In this case, Partee did not have a valid driver's license as he traveled through the checkpoint and the resulting criminal-information check showed that he had an outstanding warrant. As such, he was placed under arrest. During his arrest, cocaine was found on his person. He entered a conditional guilty plea to possession of thirty-five grams of cocaine with the intent to deliver. He was sentenced to 126 months' imprisonment and an additional five years' suspended imposition of sentence.

At the suppression hearing the trial court found that the purpose of the safety checkpoint was to verify driver's license, registration, and insurance of the drivers who were on the road on this particular date prior to a holiday and that the location of the checkpoint was given ample consideration by the officers who planned it. The court also found that the particular checkpoint location was selected for safety reasons—so that traffic could be easily reduced to one lane traveling each direction. Although there was some inconsistency in recalling if every car was stopped that was due to the passage of time, the trial court specifically found that the weight of the testimony was that every car was stopped and checked for license, insurance, and registration. It also found that despite there being no advance warning of the roadblock, the checkpoint was visible based on the officers' use of directional LED lights, police lights, and reflective safety vests.

The court summarized by stating that "considering the totality of the circumstances ... this particular checkpoint was reasonable and valid." However, the court went on to note that if Arkansas law required checkpoints to comply with National Highway and Transportation Safety Administration standards, "then the outcome would certainly be much different." On appeal, Partee claims that the circuit court erred in its denial of his motion to suppress evidence because he was seized at an unconstitutional checkpoint.[1] Specifically, he urges this court to adopt the standards set forth by the NHTSA.

Indeed, a Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). The question thus becomes whether such seizures are reasonable under the Fourth Amendment. *Id.* at 450, 110 S.Ct. 2481. Further, the permissibility of vehicle stops made on less than reasonable suspicion of criminal activity must be judged in each case by balancing the effect of the intrusion on the individual's Fourth Amendment rights against the promotion of a legitimate government interest. *Camp v. State*, 26 Ark.App. 299, 764 S.W.2d 463 (1989). The Supreme Court explains this case-by-case balancing test as follows:

> Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and

---

1. To the extent that Partee's appellate argument relies on Article 2, § 15 of the Arkansas Constitution, it shall not be considered by this court as it was not raised below. His argument was completely isolated to a federal Fourth Amendment constitutional challenge.

the severity of the interference with individual liberty.

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

*Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

Some of the various factors to be considered in applying the balancing analysis include: the supervision of the individual officers in the field, the limited discretion of the officers in stopping vehicles, the amount of interference with legitimate traffic, the subjective intrusion on the part of the travelers, the supervisory control over the operation, and the availability of a less intrusive means of promoting the legitimate government interest. *See generally* Theresa Ludwig Kruk, Annotation, *Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations,* 37 A.L.R.4th 10 (1985).

In support of reversal, Partee relies on the general principles contained in the Bill of Rights and a rather historic view of our country's founding. Specifically, he claims that in order to ensure the constitutionality of its safety-checkpoint operations, Arkansas should adopt the following NHTSA guidelines:[2] 1) Site selection should be based on relevant data; 2) Speed limits and how they affect motorists and maximum visibility should be posted; 3) Public awareness to heighten awareness of the citizens; 4) There should be a systematic procedure for collection of data and an after-impact analysis; 5) There should be signage available to warn motorists they are approaching a roadblock; 6) Records should be kept of the number of cars stopped and the arrests made; 7) There should be a written policy in effect. And, if we were to institute these safeguards, Partee claims that "not one single one of these recommendations/factors were followed in this case." And, he is not far off the mark in his assertion.

In this case, officers failed to satisfy most of the NHTSA recommended safeguards for checkpoints. However, these deficiencies do not necessarily result in the checkpoint failing to pass constitutional muster. Partee's argument relies on cases from other jurisdictions that have found certain factors, such as written guidelines, a local or statewide policy or program, advance publicity, data on site selection, and supervision at the site, to be constitutional prerequisites to a valid checkpoint. However, our courts have found those factors to be merely relevant matters to be considered by a court in the overall balancing process. *Mullinax v. State,* 327 Ark. 41, 938 S.W.2d 801 (1997).

Mullinax argued that the Fourth Amendment required a statewide administrative or statutory plan for implementing roadblocks, relying on the Texas Court of Criminal Appeals' decision in *Holt v. State,* 887 S.W.2d 16 (Tex.Crim.App.1994). Our supreme court rejected the argument and found the *Holt* decision to be unpersuasive.

---

**2.** Chris Hankins, an instructor from the Law Enforcement Academy, testified at trial that these factors ought to be considered when determining the constitutionality of a roadblock.

The court said: "Although *Sitz* did involve a comprehensive statewide program with guidelines for implementing sobriety checkpoints, we do not interpret the *Sitz* decision as holding that a statewide program is a prerequisite to instituting a constitutional roadblock." 327 Ark. at 48, 938 S.W.2d at 805. And, in *Camp v. State*, 26 Ark.App. 299, 764 S.W.2d 463 (1989), our court specifically held that a roadblock that was established for the purpose of checking drivers' licenses and vehicle registration was reasonable under the Fourth Amendment. Our court specifically noted the importance of qualified drivers and safe vehicles using the highways and that the court was not aware of a less intrusive means of making that determination. *Id.* at 304, 764 S.W.2d at 466 (1989).

█ Here, the roadblock was established for the purpose of determining that licensed and safe drivers were using the public roadway and there was no evidence that the roadblock was |₈established as a subterfuge for detection of any other criminal activity. It was carried out in an area where the speed limit was reduced, the flow could easily be narrowed to two lanes, and there was plenty of space to pull over non-compliant vehicles. The identity of the officers and the presence of their vehicles were obvious due to the identifying vests worn by the officers and the flashing blue lights. The motorists were only stopped briefly and this was a checkpoint stop rather than a roving patrol. Thus, the level of intrusion was slight. *Sitz*, 496 U.S. at 452–53, 110 S.Ct. 2481.

Further, the officers did not make random stops using unbridled discretion but stopped all vehicles based on an established procedure conceived prior to the roadblock. The roadblock was authorized (the third of its kind that year) by the Commissioner and Police Chief and the officers were briefed on the procedures before and after. It was linked to safe holiday travel and targeted all vehicles traveling that area. Certainly, it would have been preferable for the checkpoint to have been carried out in accordance with a written policy, accompanied by an announcement to the public, with clear warning signs that a stop was coming, and records and data relating to the number of stops made. However, these things are not constitutional prerequisites for safety-checkpoints under either Arkansas or federal law. As such, we affirm the trial court's denial of the motion to suppress and affirm Partee's conviction.

Affirmed.

GLOVER and BAKER, JJ., agree.