2013 Ark. App. 177

**Ross JACOBS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 12–783.**

Court of Appeals of Arkansas.

March 13, 2013.

Rehearing Denied April 17, 2013.

John F. Gibson, Jr., Monticello, for appellant.

Dustin McDaniel, Att'y Gen., by: Vada Berger, Ass't Att'y Gen., for appellee.

BRANDON J. HARRISON, Judge.

A jury found appellant Ross Jacobs guilty of driving while intoxicated (DWI) and refusing to submit to a chemical test. He now appeals his convictions, arguing that the circuit court erred in denying his motion to suppress and not allowing him to attack the credibility of a state trooper

who testified for the State. We find no error and affirm.

On 20 August 2011, the Arkansas State Police conducted a sobriety checkpoint on State Highway 35 near Monticello. The first vehicle through the checkpoint was driven by Jacobs. Shortly after passing through the checkpoint, he pulled over and was put through a number of sobriety tests. Jacobs was arrested and charged with DWI and refusing to submit to a chemical test. He was tried and convicted in the Drew County District Court of both charges and ordered to pay $940 in fines, costs, and fees. Jacobs appealed to the Drew County Circuit Court, where he promptly filed a motion to suppress and argued that the initial traffic stop was made without reasonable suspicion or probable cause, so the stop violated Arkansas and federal law.

The court held a hearing on the motion to suppress on 23 April 2012, at which Jacobs argued that police were still setting up the roadblock and that it had not been sufficiently established to pass constitutional muster. Bo Norris, a trooper with the Arkansas State Police, testified that at 8:30 p.m., he and two other officers were at the checkpoint. He stated that the checkpoint's purpose was to look for intoxicated or impaired drivers and to check for driver's licenses and vehicle registrations, seat-belt and child-restraint violations, and any other violations that were in plain view. Norris explained that, upon arriving at the checkpoint, he notified dispatch that they were starting the checkpoint and that he and the other officers were wearing reflective vests, had their vehicles blue lights on, and had spotlights turned on. According to Norris, Jacobs drove through the checkpoint and stopped approximately two hundred yards down the road. Norris said that when he saw Jacobs run the checkpoint, he got in his vehicle and drove down the road to meet Jacobs.

On cross-examination, Norris said that he did not know why Jacobs had stopped, but he later explained that he had "hollered" at Jacobs and waved his flashlight as Jacobs drove by. Norris also explained that Sergeant Watson was the supervising officer that night but that Watson had not arrived when Jacobs was stopped. Norris stated that, when the checkpoint was conducted, he and the other officers had not received a written plan for the checkpoint, nor had they held a meeting before starting the checkpoint. But, Norris also said that sergeant Watson advised him to start a checkpoint, he spoke with Watson about where to set it up, and Watson designated Norris as the supervising officer until Watson arrived. Norris stated that he and Watson discussed what time the checkpoint would start and "all the details of what was going to happen."

Jacobs testified that he was headed east on the highway when he suddenly saw blue lights pop up on the right side of the road, that there was another car on the left side of the road moving in his direction, and that he assumed the blue lights were intended for the other car. As he drove past the police vehicle, Jacobs said, the trooper (Norris) "got out, waved his flashlight and told me to pull over." Jacobs stated that he saw no other indication that a checkpoint was being conducted.

In April 2012, the court denied Jacobs's motion to suppress. The court's order found that the roadblock was legal:

> The officers were in the process of just beginning to set up the roadblock at the time Mr. Jacobs passed them. At least one of the vehicles used by the officers in question had its blue lights on, if not all of them. When Mr. Jacobs passed through the roadblock he did not stop and Officer Norris flagged him down,

which caused him to stop down the road. Norris then followed in his vehicle, and proceeded to conduct his case as he would have at the roadblock, eventually leading to Mr. Jacobs arrest on the charges in this case.

The court concluded that the stop was reasonable under both the Arkansas and United States Constitutions and that Norris's actions were reasonable under the circumstances.

In June 2012, Jacobs filed a second motion to suppress and argued that Norris had arrested Jacobs without probable cause to believe that his blood-alcohol content was .08 or more or that Jacobs was intoxicated. The court convened a jury trial on 20 June 2012, and during pretrial discussion, Jacobs conceded that the stop was reasonable. He then asked that the court hear the testimony on his second suppression motion during the trial itself, and the court agreed to reserve its ruling on the suppression issue.

Norris again testified and described the sobriety checkpoint. He explained that the checkpoint's location had wide shoulders, making it a safe location for checkpoints, and that the police had "done numerous checkpoints there in the past and since this date." He also stated that Sergeant Watson contacted him and told him to start the checkpoint at 8:30 p.m.

Norris also testified about his encounter with Jacobs after he had pulled over. Norris stated that he advised Jacobs that the police were conducting a sobriety checkpoint and asked Jacobs why he did not stop; Jacobs replied that he did not realize it was a checkpoint. Norris said that he could smell a strong odor of intoxicants coming from inside the vehicle and that he saw an empty beer can and a bottle of tequila on the floorboard. Norris explained that Jacobs's eyes were bloodshot and watery and that his speech was slightly slurred, which are indicators that a person has been drinking alcohol. Jacobs also admitted to Norris that he had been drinking alcohol—"a few beers"—earlier that evening. According to Norris, he then administered a portable breath test and field-sobriety tests. Jacobs failed two out of three field-sobriety tests, and after administering another portable breath test, Norris arrested Jacobs for DWI. Once they arrived at the Drew County Detention Center, Norris read Jacobs his statement of rights, but Jacobs refused to sign the form and refused to take a breath, blood, or urine test.

Corporal Mitch Grant with the Arkansas State Police testified that he had made approximately eight hundred to a thousand DWI arrests over the course of his seventeen-year career and explained to the jury that, based on the results of the field-sobriety tests and the portable breath tests, he agreed with Norris's decision to arrest Jacobs. During cross-examination, Jacobs attempted to question Grant about a demotion, and the State objected. Jacobs argued that the demotion was relevant to Grant's credibility. A bench conference was held, and Jacobs proffered a letter from the Arkansas State Police that purportedly showed that Grant had been "suspended for untruthfulness." After reviewing the letter, the court found that the subject of the letter did not have anything to do with Mr. Grants truthfulness and sustained the objection.

At the close of the defense's case, Jacobs again argued that he should be allowed to question Grant about his demotion. The court said no. Jacobs also requested a ruling on the motion to suppress, and the court denied the motion, finding that "[t]here was sufficient evidence to have a reasonable suspicion or cause based on the results of the field-sobriety tests and the breathalyzer given." The jury found Ja-

cobs guilty of DWI and refusing to submit to a chemical test. The court sentenced Jacobs, and he appeals the sentencing order.

 Jacobs first argues that the circuit court erred in denying his motion to suppress. When reviewing a circuit court's denial of a motion to suppress, we make an independent determination based on the totality of the circumstances. *Gilbert v. State,* 2010 Ark. App. 857, 379 S.W.3d 774. We defer to the circuit court's credibility and weight-of-the-evidence determinations, and we reverse only if the court's decision is clearly against the preponderance of the evidence. *Id.*

 ₆A Fourth Amendment seizure occurs when a vehicle is stopped at a roadblock or checkpoint. *See Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *Mullinax v. State,* 327 Ark. 41, 938 S.W.2d 801 (1997). The question then becomes whether such a seizure is reasonable under the Fourth Amendment. *See Mullinax, supra.* Where a vehicle stop is made on less than reasonable suspicion of criminal activity, its permissibility is determined by a balancing test. *Id.* 41, 938 S.W.2d 801 That test, as enunciated by the United States Supreme Court in *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), requires us to consider three factors: (1) a weighing of the gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest, and (3) the severity of the interference with individual liberty.

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

*Brown,* 443 U.S. at 51, 99 S.Ct. 2637.

Jacobs argues that the checkpoint did not comply with the state police's own policy and procedures. He asserts that the supervising officer did not conduct a briefing with the participating officers, that there were no warning signs, flares, or safety cones used in combination with the blue lights on the patrol cars; and that "there was nothing to indicate there was a checkpoint in progress when [Jacobs] passed through." Thus, Jacobs argues, the "scales fail to tip in favor of the State's legitimate interest to deter drunk driving" and instead "tilt in favor of [Jacobs's] right against unreasonable searches and seizures." Jacobs also argues ₇that without a legally established roadblock, Norris lacked reasonable suspicion to stop and detain him.

The State argues that the checkpoint passed constitutional muster. Although Jacobs mentions a lack of warning signs, flares, or safety cones, the law-enforcement policy manual states only that these devices "may" be used with marked patrol vehicles, not that they must be used. Further, the State argues, even if the checkpoint did not turn square corners, suppression is not required because our supreme court has determined that the constitutionality of a checkpoint does not depend on a specific, written plan or program. *See Mullinax, supra.*

The circuit court did not err when it denied the motion to suppress. Jacobs does not challenge the State's interest in preventing accidents caused by drunk driv-

ers, the degree to which the sobriety checkpoint advanced that interest, or the level of intrusion on his privacy rights that the checkpoint may have caused. Jacobs argues that the law-enforcement policy manual was not strictly followed and that, essentially, he lacked notice that a checkpoint had been established. Out Jacobs has cited no authority for the proposition that the failure to strictly follow the policy manual renders a roadblock unconstitutional. And based on the testimony regarding Norris's discussion of the checkpoint's procedures and location with his supervising officer, we hold that a "plan embodying explicit, neutral limitations" was followed in this case and, therefore, the court did not err.

■ For his second point, Jacobs says that the circuit court should have let him attack Grant's credibility by questioning him about a prior disciplinary action that resulted in Grant's demotion. Rule 608 of the Arkansas Rules of Evidence is the pertinent rule, and it provides

> (b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Ark. R. Evid. 608(b) (2012). The Arkansas Supreme Court has interpreted Rule 608 to permit inquiries on cross-examination into conduct that are clearly probative of truthfulness or untruthfulness but to disallow cross-examination into specific instances that are merely probative of dishonesty. *See, e.g., Bailey v. State,* 334 Ark. 43, 56, 972 S.W.2d 239, 246 (1998). Specifically, our supreme court has adopted a three-part test for admissibility: the question must be asked in good faith, the probative value must outweigh its prejudicial effect, and the prior conduct must relate to the witness's truthfulness. *Id.* This test must be considered along with our settled law that evidentiary matters regarding the admissibility of evidence are left to the sound discretion of the circuit court. We will not reverse absent an abuse of discretion that prejudices a defendant. *Id.*

Here, Jacobs asserts that Grant had been disciplined for misconduct, specifically a violation of the "Arkansas State Police policy on truthfulness," and that under Ark. R. Evid. 608(b), Jacobs should have been allowed to cross-examine Grant on this issue. Jacobs claims that he met the required test because, based on the proffered letter, Grants demotion was raised in good faith, the probative value of the question far outweighed any prejudicial effect it might have had, and the demotion clearly related to Grant's truthfulness. The State argues that the letter was broadly worded and did not explain fulsomely enough the facts behind the demotion.

There was no abuse of discretion. Jacobs's proffered exhibit is a letter to Grant from Colonel Winford Phillips of the Arkansas State Police. The letter concerns a final administrative decision on allegations that Grant violated the "following Arkansas State Police Policies: Officers to be courteous; Failure to perform duties properly; Unbecoming conduct; and, Truthfulness." In the letter, Phillips advised Grant that the charges had been substantiated and that certain disciplinary actions were imposed, including the requirement that Grant attend anger-management

classes. The letter does not explain the specific allegations against Grant or how these allegations relate to his truthfulness. We agree with the circuit court that the letter was not clearly probative of truthfulness or untruthfulness. It did not abuse its discretion in disallowing cross-examination that was, at best, only probative of dishonesty.

Affirmed.

VAUGHT and WOOD, JJ., agree.