

Cite as 2015 Ark. App. 706

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR–14–980

| | |
|---|---|
| JEREMY EDWARD WHALEN<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | **Opinion Delivered:** December 9, 2015<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. MC-13-202]<br><br>HONORABLE STEPHEN TABOR, JUDGE<br><br>REVERSED AND DISMISSED |

## WAYMOND M. BROWN, Judge

Appellant appeals from the circuit court's judgment finding him guilty of driving while intoxicated—first offense. On appeal, appellant argues that 1) the Fourth Amendment to the United States Constitution, along with Article II, Section 15 of the Arkansas Constitution, requires reversal of his conviction based on the illegally conducted sobriety checkpoint; and 2) the circuit court erred in its failure to recognize the lack of probable cause to support any further roadside detention of appellant. We reverse.

On September 20, 2012, appellant encountered a sobriety checkpoint being conducted by the Arkansas State Police on Interstate 540. He was arrested there and later charged with driving while intoxicated—first offense. A trial on the matter was held on July 29, 2014. The circuit court issued its ruling finding defendant guilty in a judgment entered on July 31, 2014.

This timely appeal followed.

When making his initial motion below, appellant's counsel stated that "at this point I have a motion, and that's that this is an illegal roadblock." Then, when the State rested, he stated "we rest just with our very strong objection to the roadblock. And, again, cite a litany of cases, but for Arkansas *State versus Alan* [sic], 2313 [sic] Ark 35, which quotes *Price v. Delaware, Brown v. Texas.*" He also cited *Delaware v. Prouse*[1] and *Mullinax v. State.*[2] Appellant's counsel moved that the roadblock was illegal and therefore unconstitutional. He did not make any specific arguments involving the words suppress or dismiss, or any variation thereof. There was no prior hearing. Furthermore, it appears that even the circuit court was not clear on what type of motion appellant was making for it wrote in its judgment that "[t]he motions to suppress and/or dismiss of Defendant are denied." On the record before this court, there is not sufficient evidence to determine whether appellant made a motion to suppress the evidence or a motion to dismiss the case, or both. But the circuit court denied both in its order; accordingly, we address both.

When reviewing a circuit court's denial of a motion to suppress, we make an independent determination based on the totality of the circumstances.[3] We defer to the

---

[1] 440 U.S. 648 (1979).

[2] 53 Ark. App. 176, 920 S.W.2d 503 (1996).

[3] *Jacobs v. State*, 2013 Ark. App. 177, at 5, 427 S.W.3d 83, 87 (citing *Gilbert v. State*, 2010 Ark. App. 857, 379 S.W.3d 774).

circuit court's credibility and weight-of-the-evidence determinations, and we reverse only if the court's decision is clearly against the preponderance of the evidence.[4]

A motion to dismiss at a bench trial, like a motion for directed verdict at a jury trial, is considered a challenge to the sufficiency of the evidence.[5] We will affirm a circuit court's denial of the motion if there is substantial evidence, either direct or circumstantial, to support the verdict.[6] In reviewing the sufficiency of the evidence, we review all the evidence, including any that was erroneously admitted.[7] Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture.[8] This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered.[9]

A Fourth Amendment seizure occurs when a vehicle is stopped at a roadblock or checkpoint.[10] The question then becomes whether such a seizure is reasonable under the

---

[4] *Id.*

[5] *Stewart v. State*, 2010 Ark. App. 9, at 2, 373 S.W.3d 387, 389 (citing *Cora v. State*, 2009 Ark. App. 431, 319 S.W.3d 281).

[6] *Id.* (citing *Cora*, *supra*).

[7] *Id.* (citing *LaRue v. State*, 34 Ark. App. 131, 806 S.W.2d 35 (1991)).

[8] *Foster v. State*, 2015 Ark. App. 412, at 4, 467 S.W.3d 176, 179 (citing *Thornton v. State*, 2014 Ark. 157, 433 S.W.3d 216).

[9] *Id.*

[10] *Jacobs*, 2013 Ark. App. 177, at 6, 427 S.W.3d at 87 (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444 (1990); *Mullinax v. State*, 327 Ark. 41, 938 S.W.2d 801 (1997)).

Fourth Amendment.[11] The permissibility of vehicle stops made on less than reasonable suspicion of criminal activity must be judged in each case by balancing the effect of the intrusion on the individual's Fourth Amendment rights against the promotion of a legitimate government interest.[12] There is no doubt as to the magnitude of the State's interest in eradicating drunk driving.[13] The United States Supreme Court has stated the following in *Brown v. Texas* regarding this balancing test:

> Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.
>
> A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.[14]

Some of the various factors to be considered in applying the balancing analysis include the supervision of the individual officers in the field, the limited discretion of the officers in stopping vehicles, the amount of interference with legitimate traffic, the subjective intrusion

---

[11] *Id.* (citing *Mullinax*, *supra*).

[12] *Partee v. State*, 2010 Ark. App. 805, at 5, 379 S.W.3d 82, 84 (citing *Camp v. State*, 26 Ark. App. 299, 764 S.W.2d 463 (1989)).

[13] *Mullinax*, 327 Ark. at 46, 938 S.W.2d at 804 (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 451 (1990)).

[14] 443 U.S. 47, 50–51 (1979) (internal citations omitted).

on the part of the travelers, the supervisory control over the operation, and the availability of a less intrusive means of promoting the legitimate government interest.[15]

Appellant argues that the sobriety checkpoint that led to his arrest was unconstitutional and unlawful because it was conducted in an illegal manner. The State argues that compliance with Arkansas State Police (ASP) policy and procedures, as was indicated on the ASP Sobriety Checkpoint Plan, is sufficient to support a finding that the checkpoint was conducted in a constitutionally acceptable manner. However, the State provides no authority to support this argument. We agree with appellant that this sobriety checkpoint was conducted in an illegal manner.

Corporal Dwight Lee testified that "[s]ometimes roadblocks are assigned and if [the supervisors] don't assign them, I will make a call and say, you know, we're going to do a checkpoint." He testified that the supervisors "don't actually know where" the checkpoint is. He stated that "[i]n this case, it was most likely [his] discretion" in setting up the checkpoint. He described himself as "an officer in the field" and stated that "[i]t is the officer in the field using his discretion as to what would happen at the roadblock." He further noted that "as far as dealing with individuals we come in contact with, traffic flow, location, and times, all of that is the officer in the field." They normally would only call the supervisor if there was some major occurrence like a collision or chase.

Corporal Lee testified that the officers do not keep records of the number of cars they stop, only "if [they] wrote a ticket, or anything like that." Supervisors "[n]ormally"

---

[15] *Partee*, 2010 Ark. App. 805, at 5–6, 379 S.W.3d at 85 (citing Theresa Ludwig Kruk, Annotation, Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations, 37 A.L.R.4th 10 (1985)).

received information on the checkpoint after the checkpoint had been completed. Corporal Lee stated that supervisors would not have any direct input on the plan, simply being notified after. When questioned by the circuit court, Corporal Lee agreed that calling up officers and telling them they were going to set up a checkpoint was "all there [was]" to the procedure for the checkpoint; that he did not go over the plan with the officers or talk with them about it beyond the intended duration of the checkpoint; and that they do not even mention checkpoints to the supervisors until after they have been completed because the supervisors expect the checkpoints to be done. He restated that he sends the paperwork in after the checkpoint. Furthermore, he agreed that the "main purpose" of setting up a checkpoint was to keep the officers from getting in trouble.

Trooper Brandon Margis testified that sometimes the officers received emails from the supervisor instructing them to set up a checkpoint, but sometimes the officers in the field—sometimes including sergeants, but not always—just got together and decided to have a checkpoint. He testified that they intended to stop every vehicle, but would use their discretion to allow vehicles to "go through" when traffic was backed up until it was no longer backed up.

While the plan is not required to be written, there must be a plan.[16] Officer testimony appears to belie the notion that there was a plan. Their testimony purports that there was a plan; however, there was no supervision over the checkpoint and there was no limitation on the discretion of the officers in the field. Furthermore, while only a factor and not a

---

[16] *Mullinax*, 327 Ark. at 49, 938 S.W.2d at 806.

requirement, the officer's failure to record how many vehicles they came in contact with beyond those ticketed or arrested prevents any possible determination on the effectiveness of the checkpoints.[17]

The State says in its brief that Corporal Lee did not brief the officers because the same procedures were always followed. The State then gives a procedure that was followed. The State quotes the Sobriety Checkpoint Plan form submitted for the September 20, 2012 checkpoint to support the procedure it outlined. However, this document was a form to be completed by an officer for a checkpoint. The State failed to direct this court to any evidence in the record—documentary or testimonial—regarding official department procedure for police checkpoints and this court found none in the record. Accordingly, we cannot say that the September 20, 2012 checkpoint was conducted according to a plan or that it was conducted in a manner exhibiting explicit, neutral limitations on the officer's conduct. The circuit court erred in finding that the checkpoint was constitutional. Accordingly, we reverse the circuit court's denial of appellant's motion to suppress.

The only evidence at trial was specific to the unconstitutional checkpoint and the fruits thereof. Because there was no other evidence to support the conviction, we also reverse the circuit court's denial of appellant's motion to dismiss.

Because we reverse on appellant's first point on appeal, we do not address his second argument.

Reversed and dismissed.

VAUGHT, J., agrees.

---

[17] *Id.*, 327 Ark. at 47, 983 S.W.2d at 804 (citing *Sitz*, 496 U.S. at 454–55).

GRUBER, J., concurs.

**RITA GRUBER, Judge, concurring.** I agree with the majority's decision to reverse this case because it was error for the circuit court to find that the checkpoint was constitutional. However, I respectfully concur because, in my view, the checkpoint was conducted according to a plan. The constitutionality of a checkpoint does not depend on a specific, written plan or program. *Jacobs v. State*, 2013 Ark. App. 177, at 7, 427 S.W.3d 83, 87. In *Partee v. State*, this court affirmed the denial of a motion to suppress. 2010 Ark. App. 805, 379 S.W.3d 82. The police did not have a written policy on checkpoints, did not account for how many cars were stopped, and did not publicize the checkpoint. *Id.* However, the checkpoint was visible based on the officers' use of police lights and reflective safety vests, and the police department generated a memo detailing the checkpoint plan after the checkpoint took place. *Id.*

Here, testimony from Senior Corporal Dwight Lee indicated that the identity of the troopers and the presence of their vehicles were obvious due to their reflective vests, flashlights, and flashing blue lights. Corporal Lee also testified that a plan was followed and, similar to *Partee*, after the checkpoint took place, a written copy of the sobriety–checkpoint plan was generated and was "signed off on" by a supervisor. The ASP Sobriety Checkpoint Plan, which was generated following the checkpoint and signed by Sergeant Jason W. Aaron is included in the State's supplemental addendum.

The Sobriety Checkpoint Plan specifically states that officers must advise the drivers that they have entered an Arkansas State Police sobriety checkpoint, check the vehicle operator's license and registration, and direct motorists suspected of being impaired to

move their vehicles to a designated pull-off area. The plan states that officers must designate a safe site with ample space for detained motorists, use sufficient lighting, wear an Arkansas State Police high-visibility reflective vest, avoid lane blockage or potential traffic backup for prolonged periods of time, and comply with the Arkansas State Police Policy and Procedures Manual. Therefore, I cannot say that the checkpoint was not conducted according to a plan.

As stated by the majority, these are some of the factors to be considered in applying the balancing analysis: the supervision of the individual officers in the field, the limited discretion of the officers in stopping vehicles, the amount of interference with legitimate traffic, the subjective intrusion on the part of the travelers, the supervisory control over the operation, and the availability of a less intrusive means of promoting the legitimate government interest. *Partee*, 2010 Ark. App. 805, at 5–6, 379 S.W.3d at 85. The checkpoint took place on the Exit 11 exit ramp on Interstate 540. Corporal Lee testified that every vehicle coming off the ramp was stopped and checked "unless traffic [got] backed up." Corporal Lee described himself as an "officer in the field" and testified that the "traffic flow" was left to the discretion of the officer in the field. He testified that it is "the officer in the field using his discretion as to what would happen on the roadblock" and that a supervisor is called only if there is "something major like a collision or chase." This means that whether the stop was made depended only on the law-enforcement officer's discretion based on his or her subjective assessment of the level of traffic. "[T]he Fourth Amendment requires objective facts supporting the stop or a plan embodying explicit, neutral limitations." *State v. Allen*, 2013 Ark. 35, at 5, 425 S.W.3d 753, 757; *see also Brown v. Texas*, 443 U.S. 47, 51

(1979). An individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. *Allen*, 2013 Ark. 35, at 5, 425 S.W.3d at 757. Thus, in my view, although the checkpoint was conducted according to a plan, the unfettered discretion of the officers was such that the plan did not embody the explicit and neutral limitations required by the Fourth Amendment. I would reverse based on the lack of supervisory control, the interference with legitimate traffic, and the level of discretion given to the officers in the field. Therefore, I concur.

*Johnny Clay Collins II*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rebecca Kane*, Ass't Att'y Gen., for appellee.