Cite as 2023 Ark. App. 72

# ARKANSAS COURT OF APPEALS
## DIVISION III
No. CR-22-494

| | | |
|---|---|---|
| JEFFERY ROGERS | | Opinion Delivered February 15, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE SEARCY |
| V. | | COUNTY CIRCUIT COURT |
| | | [NO. 65CR-15-23] |
| STATE OF ARKANSAS | | |
| | APPELLEE | |
| | | HONORABLE H.G. FOSTER, JUDGE |
| | | |
| | | AFFIRMED |

### RITA W. GRUBER, Judge

Jeffery Rogers appeals the Searcy County Circuit Court's denial of his motion to suppress in conjunction with his conditional plea. Rogers argues that the circuit court erred by denying his motion to suppress. We affirm.

## I. *Procedural History*

On July 6, 2015, Rogers was formally charged with possession of a controlled substance in violation of Ark. Code Ann. § 5-64-419(b)(1)(B) (Supp. 2021) and possession of drug paraphernalia in violation of Ark. Code Ann. § 5-64-443(a)(1)(A) (Supp. 2021). On February 12, 2018, Rogers filed a motion to suppress evidence in which he argued that he and his property were searched in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution as well as article 2, section 15 of the

Arkansas Constitution and Ark. R. Crim. P. 2; therefore, the drug paraphernalia and methamphetamine seized as a result should be suppressed.

That same day, a suppression hearing was held, at which Arkansas State Police (ASP) Agent (formerly Trooper) Buster Finks and former Searcy County Deputy Sheriff Curtis Holliman testified. In addition, the ASP Highway Patrol Division (HPD) "Troop Special / Holiday and Sobriety Checkpoint Activity Report and Sobriety Checkpoint Plan" (Form 20), the HPD procedure regarding sobriety checkpoints, and the ASP policy regarding sobriety-checkpoint operations were admitted into evidence.

The circuit court denied the motion, ruling that the plan was put together with sufficient specificity regarding location, and the duties and safety considerations were set forth very clearly—including proper vehicle placement, the use of flashlights and reflector vests, and the method used to stop vehicles—concluding that the checkpoint passed "constitutional muster." On June 5, 2020, Rogers filed a motion to reconsider, which the circuit court denied at a pretrial hearing on January 20, 2021.

On February 28, 2022, pursuant to Ark. R. Crim. P. 24.3(b)(i), Rogers entered a conditional plea of guilty to the charges and was sentenced to 108 months' suspended imposition of sentence (SIS) on the possession charge and 36 months' SIS on the paraphernalia charge, to run concurrently. This appeal followed.

II. *Factual History*

The record reflects the following facts. There is an ASP policy for sobriety-checkpoint operations and an HPD procedure for sobriety checkpoints. Pursuant to those, a plan must

2

be documented on Form 20 prior to its execution. Form 20 serves two purposes. First, it must detail the resources at a predetermined checkpoint, such as the location and time, as determined by a supervisor and communicated to the trooper operating the checkpoint. Second, after the checkpoint concludes, the statistics from the checkpoint (for example, how many arrests occurred) are inputted on Form 20, and then it is signed.

ASP policy requires the presence of at least one additional officer at a checkpoint and dictates that if another law enforcement agency is involved, the cooperating law enforcement agency's officers must comply with the policy. Each checkpoint must have a "safe zone." The purpose of a "safe zone" is to establish a parking area for officers to funnel vehicles when an issue arises in order to maintain the flow of traffic. The trooper working the checkpoint generally establishes the safe zone, since he or she is physically on site.

On July 3, 2015, Rinks was conducting an ASP sobriety checkpoint pursuant to ASP policy in Searcy County, Arkansas, with the assistance of two Searcy County Sheriff's deputies. The plan, which was put in place and approved by Rink's supervisor prior to the beginning of the checkpoint, was that from July 3, 2015, at 23:00 until July 4, 2015, at 0:30, in consideration of the Independence Day holiday, traffic would be stopped from all three directions at the intersection of Arkansas State Highways 14 and 27. The following resources were implemented: lights visible from all directions, a safe zone established with proper placement of vehicles (with consideration of terrain), officers in uniform, blue lights activated on designated units, and reflective vests and flashlights present as needed. Every vehicle that came through the checkpoint would be stopped, the driver would be told that

he or she was being stopped because it was an ASP sobriety checkpoint, and then his or her driver's license and registration papers were requested and reviewed. The officers were to check for alcohol- or drug-impaired drivers and other obvious violations of the Arkansas criminal and traffic code. Drivers were to be thanked for being cooperative.

Rinks had minimal control of the checkpoint, could not alter the plan himself, and pursuant to the plan, every vehicle was stopped, which Rinks testified that he could not deviate from. Rinks did not have any control over when the checkpoint started but could stop it earlier if the circumstances warranted, for example, if there was no traffic and it was a waste of resources to continue operating the checkpoint. Rinks usually found out about the plan the day of or the day before the checkpoint. At times, Rinks has had input on where a checkpoint was going to be conducted because he was an officer in the field, but at other times, his supervisor would just tell Rinks where to perform a checkpoint. Rinks could not remember whether he had input on the location of the checkpoint at issue. Rinks could also not recall where the safe zone was, but thought most likely, given the checkpoint location, it would have been at the nearby gas station.

At this particular checkpoint, two Searcy County deputies were present, but Rinks did not recall how the deputies came to be there assisting. Form 20 was partially filled out on July 3 before the checkpoint being conducted and then completed with statistics and supervisor signatures on July 4.

On July 3 at approximately 11:10 p.m., a white Chevy truck approached the checkpoint. Trooper Rinks could hear the truck coming from a long distance because it was

4

"making an awful racket," and the deputies noticed that smoke was coming from the rear of the truck.[1] The truck arrived at the checkpoint and contact was made with the only occupant, the driver, who was later identified as Rogers.

Rinks told Rogers who he was and that a sobriety checkpoint was being conducted. As a courtesy and expressing a safety concern, Rinks told Rogers that he may have a problem with his truck due to the noise it was making, and he may want to look to see if there is something underneath the truck. Rinks did not instruct Rogers to pull to the side or get out of the vehicle and check the sound. Rinks did not remember if he affirmatively told Rogers he was free to leave. Rogers, of his own volition, stepped out of the driver's seat, walked around to the back, and looked underneath the rear of the truck. At that point, Rogers was not being detained, he was not in handcuffs, and he had not been subject to any investigatory questioning.

As Rogers was looking at the truck, Rinks saw that there was bulge in the white socks Rogers[2] was wearing that, based on Rinks's training and experience, appeared to be the type of pipe used for smoking methamphetamine. When Rogers got up from the ground, Rinks asked Rogers what was in his sock, and he "hemhawed around." Rinks asked Rogers if it was a meth pipe, and Rogers admitted that it was and produced a glass-smoking device containing residue. A county deputy arrested Rogers and placed him in handcuffs.

---

[1]Rinks testified that the truck did not sound like a vehicle that should have been traveling down the highway, but Rogers was not cited for any sort of defective equipment.
[2]Rogers was wearing shorts and plainly visible long socks.

Because Rogers was the sole occupant, the truck was going to be towed. As such, an inventory of his truck was performed, during which a clear baggie containing a crystalline substance was discovered. A deputy transported Rogers to the Searcy County Jail, and Agent Afton Fletcher of the 20th Judicial District Drug Task Force was called for assistance in the investigation. Fletcher tested a sample of the crystalline substance found in Rogers's truck with a field test kit, which was positive for methamphetamine.

III. *Standard of Review and Applicable Law*

In reviewing the denial of a motion to suppress evidence, this court conducts a de novo review based on the totality of the circumstances, reversing only if the circuit court's ruling denying the motion to suppress is clearly against the preponderance of the evidence. *Sheridan v. State*, 368 Ark. 510, 513–14, 247 S.W.3d 481, 483 (2007). We defer to the superior position of the trial court to evaluate the credibility of witnesses at a suppression hearing, and any conflicts in the testimony of witnesses are for the trial court to resolve. *Rainey v. State*, 2017 Ark. App. 427, at 7, 528 S.W.3d 288, 293.

The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *Id.* at 5, 500 S.W.3d at 713 (quoting *Brown v. Texas*, 443 U.S. 47, 50 (1979)). When a law enforcement officer stops and restrains a person, the officer has "seized" that person, and the Fourth Amendment requires that the seizure be reasonable. *Id.* A Fourth Amendment "seizure" occurs when a vehicle is stopped at a checkpoint. *Partee v. State*, 2010 Ark. App. 805, at 5, 379 S.W.3d 82, 84.

In order to satisfy the reasonableness requirement of the Fourth Amendment, the State must present evidence to show that the checkpoint was carried out pursuant to a previously established objective and neutral plan that was designed by supervising officers in order to limit the conduct of the field officers. *Whalen*, 2016 Ark. 343, at 6, 500 S.W.3d at 714 (citing *Delaware v. Prouse*, 440 U.S. 648 (1979)). The plan for the checkpoint is not required to be in writing. *Whalen*, 2016 Ark. 343, at 6, 500 S.W.3d at 714 (citing *Mullinax v. State*, 327 Ark. 41, 938 S.W.2d 801 (1997)). In *Mullinax*, the Arkansas Supreme Court explained that the roadblock at issue had been carried out pursuant to a constitutionally sufficient plan where the field officer participating in the roadblock testified that the particular procedures and location of the roadblock had been discussed with the superior officer. *Id.*

The United States Supreme Court has held that the "essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions . . . .'" *Whalen*, 2016 Ark. 343, at 7, 500 S.W.3d at 714 (quoting *Prouse*, 440 U.S. at 653–54) (further citations omitted).

In *Whalen*, the supreme court identified two factors that are critical to a finding that a field officer's discretion was properly limited: (1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to

7

be used in operating the roadblock. *Id.* (citing *State v. Hicks*, 55 S.W.3d 515, 533 (Tenn. 2001)). The *Hicks* court explained that the "State must show that some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation." *Hicks*, 55 S.W.3d at 533. Finally, the court stated that these factors are so essential to the reasonableness of a roadblock that the absence of either factor will result in the invalidation of the stop. *Id.*

IV. *Analysis*

As a threshold issue, the State contends that because Rogers has limited his challenge on appeal to the constitutional validity of the checkpoint, he has abandoned his earlier arguments that he was the subject of an illegal *Terry* frisk and an illegal inventory of his vehicle. We agree. The sole issue on appeal is the validity of the checkpoint, which Rogers argues was not conducted pursuant to a preapproved plan, and the individual field officers were given too much discretion. The State responds that the record establishes that there was explicit, neutral criteria for determining which vehicles to stop, and the plan indicated that the checkpoint was conducted in compliance with ASP policies and procedures governing the conduct of the officers, whose discretion was appropriately curtailed. Both parties appear to agree that this case is governed by *Whalen*, *supra*. However, we agree with the State that this case is distinguishable from *Whalen*.

In *Whalen*, the trooper testified that if a supervisor did not assign the checkpoint, the trooper would call and notify the supervisor that he was going to do a checkpoint, and the

8

supervisor would say okay. However, the supervisor would not normally know the location ahead of time because the supervisors liked for the officers in the field to conduct numerous checkpoints and to pick the checkpoint locations. *Whalen, supra*. The trooper further testified that he would generally pick the location and contact "the other guys" to tell them the checkpoint locations, and that the specific checkpoint location at issue had most likely been chosen by him. *Id.* at 3, 500 S.W.3d at 712.

It was also within the trooper's discretion to decide whether to allow traffic to come through without stopping if traffic was backed up, what to do with individuals he encountered, the flow of traffic, and the location. *Id.* Once the checkpoint was concluded, Form 20 was filled out and then submitted to a supervisor. *Id.* The trooper explained that the supervisors did not have any direct input in planning the checkpoints; rather, they were notified through the submission of the written plan, and the checkpoints were not even mentioned to the supervisors until after the checkpoint has been performed. *Id.* No ASP policies or procedures were part of the *Whalen* record on appeal. *Id.*

In *Whalen*, the trooper testified that Whalen stopped at the checkpoint, the trooper could smell the odor of intoxicants, and attempted to administer a portable breathalyzer test to Whalen. Whalen refused to take it, which resulted in Whalen's being criminally charged. *Id.* Whalen filed a motion to suppress, which was denied by the circuit court, and Whalen was ultimately convicted of driving while intoxicated-first offense. *Id.* Ultimately, the supreme court held that the checkpoint was violative of the Fourth Amendment and its Arkansas Constitution corollary. *Id.*

Here, Rogers argues that the checkpoint was not carried out in a constitutionally sound manner, primarily because Form 20 did not appear to be signed and dated until sometime on July 4, which he contends is evidence that there was no plan in place *prior* to the execution of the checkpoint.

However, Rinks testified that there was an ASP policy for checkpoints and how they were to be conducted, which Rinks followed. Rinks testified that the plan in place prior to the initiation of the checkpoint was that traffic was being stopped from all three directions at the intersection of Arkansas State Highways 14 and 27, lights were visible from all directions, every vehicle that came through the checkpoint would be stopped, and the driver would be told that he or she was being stopped because it was an ASP sobriety checkpoint and asked for his or her driver's license, which was set out in Form 20. Rinks testified that he had no discretion on the time the checkpoint began or how it was going to be conducted with respect to who would be stopped and what information would be relayed to each vehicle stopped. Rinks explained that Form 20 cannot be completed and signed until after the completion of the checkpoint, and in this instance, it was partially filled out on July 3, prior to the checkpoint being conducted, and then completed with statistics and supervisor signatures on July 4.

What was abundantly clear in *Whalen* was that the trooper had no prior plan of any kind and had unfettered discretion with respect to when, where, and how the checkpoint was initiated and then conducted. The trooper testified that, essentially, he could do whatever he wanted. No ASP policy or procedure was admitted into evidence. The same

10

cannot be said here. The circuit court appeared to credit Rinks's testimony, ruling that the plan was put together with sufficient particularity and specificity as to location and purpose, and the duties and safety considerations were set forth clearly, including proper placement of the vehicles, use of flashlights and reflector vests, the method used to stop the vehicles, where the vehicles were placed on the side of the road, and the officers that were involved. We defer to the superiority of the circuit court to evaluate the credibility of witnesses who testify at a suppression hearing. *Rainey, supra*. In addition, the ASP policy regarding sobriety-checkpoint operations and the HPD procedure regarding sobriety checkpoints were admitted into evidence here.

Having conducted a de novo review of the totality of the circumstances, we cannot say that the circuit court's ruling denying the motion to suppress was clearly against the preponderance of the evidence. Therefore, we affirm the denial of Rogers's motion to suppress.

Affirmed.

ABRAMSON and BARRETT, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser* and *Erin Cassinelli*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.